UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X

LOUIS VUITTON MALLETIER,　　　　:

　　　　　　　　:

　　　　　Plaintiff,　　　　:

　　　　　　　　:

　　- against -　　　　:

　　　　　　　　:

DOONEY & BOURKE, INC.,　　　　:

　　　　　　　　:

　　　　　Defendant.　　　　:

　　　　　　　　:

------------------------------------------------X

**OPINION & ORDER**

04 Civ. 2990 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.　INTRODUCTION

District courts are tasked with the "special obligation"[1] of serving as the "gatekeepers" of expert evidence, and must therefore decide which experts may testify and present evidence before the jury.[2]　Recognizing that a purported expert's opinion often carries special weight with the jury even when unwarranted,[3] the Supreme Court has directed district courts to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but

---

[1]　*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 137 (1999).

[2]　*See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[3]　*See Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001).

1

reliable."[4] Courts are given "broad latitude" in deciding "how to determine reliability" and in making the "ultimate reliability determination."[5] In doing so, however, courts are reminded that the Federal Rules of Evidence favor the admissibility of expert testimony,[6] and their "role as gatekeeper is not intended to serve as a replacement for the adversary system."[7] Indeed, "[w]here the expert's conclusion is drawn from a reliable methodology . . . the correctness of that conclusion is still an issue for the finder of fact."[8] As a result, excluding expert testimony is the exception rather than the rule,[9] particularly since "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" can serve as the means to "attack[] shaky but admissible

---

[4]     *Daubert*, 509 U.S. at 589. The Supreme Court in *Kumho* extended this gatekeeping function to expert testimony based on "technical" and "other specialized" knowledge, in addition to testimony based on scientific knowledge. *See Kumho*, 526 U.S. at 141.

[5]     *Kumho*, 526 U.S. at 142 (citing *General Electric Co. v. Joiner*, 522 U.S. 136, 143 (1997)).

[6]     *See Daubert*, 509 U.S. at 588.

[7]     *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996).

[8]     *Manual for Complex Litigation (Fourth)* § 23.24 (2004).

[9]     *See* Fed. R. Evid. 702 Advisory Committee Note.

evidence."[10]

In cases arising under the Lanham Act, the Court's gatekeeper function is of heightened importance because the "pivotal legal question . . . virtually demands [expert] survey research . . . on [issues such as] consumer perception . . . ."[11] Indeed, expert survey evidence is used more frequently in trademark law cases than in other areas of law,[12] and courts have been advised to carefully scrutinize survey evidence particularly where a jury rather than a bench trial is contemplated.[13]

While errors in a survey's methodology usually go to the weight accorded to the conclusions rather than its admissibility,[14] the Second Circuit has made clear that this is "subject, of course, to Rule 403's more general prohibition

---

[10]     *Daubert*, 509 U.S. at 596. *See also Manual for Complex Litigation (Fourth)* § 23.24 (2004) ("Cross-examination and presentation of contrary evidence by the opposing party, as suggested in *Daubert*, would identify for the jury the shakiness of the foundation on which the conclusion is based.").

[11]     Shari Seidman Diamond, *Reference Guide on Survey Research*, in *Reference Manual on Scientific Evidence (Second)* 229, 235 (2000).

[12]     *See Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 225 (2d Cir. 1999).

[13]     *See Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, No. 06 Civ. 550, 2007 WL 2258688, at *11 (S.D.N.Y. Aug. 6, 2007).

[14]     *See Schering*, 189 F.3d at 228.

against evidence that is less probative than prejudicial or confusing."[15]   Although it is the exception, "there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact . . . ."[16] and "its probative value is substantially outweighed by its prejudicial effect."[17]

As evident from the Report and Recommendation ("R&R") issued by Professor Daniel J. Capra of Fordham University School of Law and Professor Barton Beebe of Cardozo School of Law (collectively, the "Special Masters"), much of the expert testimony proffered by the parties here warrants exclusion. The Special Masters acknowledged that their recommendation to exclude the majority of the expert testimony may seem "drastic."[18] They justify their conclusions, inter alia, on the ground that while methodological flaws in a survey generally raise questions of weight rather than admissibility, "questions of weight,

---

[15]     *Id.* (citations omitted).

[16]     *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993).

[17]     *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 307 (S.D.N.Y. 2001) (citing *Schering*, 189 F.3d at 228).  *Accord Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*, Nos. 02 Civ. 3691, 03 Civ. 707, 2004 WL 326708, at *7 (S.D.N.Y. Feb. 23, 2004).

[18]     6/15/07 Report and Recommendation of the Special Masters ("R&R").

4

when sufficiently accumulated, become so serious as to require exclusion."[19] The

Special Masters further noted that the majority of the testimony presented "easy

cases" for exclusion, but nevertheless, they aimed to "give each submission a fair

reading with an evenhanded application of the law."[20]

Although the parties might regard the R&R to be severe in the scope

of its recommended exclusions, the Second Circuit Court of Appeals and the lower

courts within this Circuit provide support for the exclusion of survey evidence

primarily under Rule 403 but also under Rule 702 where flaws are deemed to

cumulatively undermine its relevance and reliability.[21]  Additionally, other courts

---

[19]     *Id.* at 191. *See also id.* at 10-11 ("While courts in the Second Circuit
rely mainly on Rule 403 to exclude unreliable surveys, we note that Rule 702 is
clearly applicable as well, because the result of a survey is essentially expert
testimony, and Rule 702 requires that such testimony must be reliable.  The
bottom line is that if the survey suffers from substantial flaws, it will be excluded
under both Rule 403 and Rule 702.").

[20]     *Id.* at 191.

[21]     *See, e.g., Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 296-98 (2d
Cir. 1999) (affirming district court's exclusion of survey as irrelevant in trademark
infringement case where survey did not test for or demonstrate likelihood of
confusion and any probative value was outweighed by prejudicial effect);
*Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir.
1984) (finding survey to be "badly flawed" where it utilized an improper universe
and posed an unfair and leading question to respondents); *Kargo Global*, 2007
WL 2258688, at *6-12 (excluding consumer confusion survey where it used
improper stimuli and an impermissibly leading format that failed to approximate
real-world conditions); *Trouble*, 179 F. Supp. 2d at 307-08 (excluding survey

considering the admissibility of expert survey evidence in trademark suits have reached similar conclusions.[22]

Upon review of the R&R, it is beyond cavil that the Special Masters discharged their duty with careful consideration and thoughtful analysis of the parties' opposing positions, the factual details of the expert reports and testimony at issue, the relevant evidentiary rules, and the case law. The Special Masters considered each expert's survey on its own terms and while the number of

---

under Rule 403 "[g]iven the lack of a proper universe and sample, the poor choice of location, the lack of proper stimuli, and questions that have little or no relevance to issues in the case"); *Mastercard*, 2004 WL 326708, at *9-10 (excluding survey under Rules 403 and 702 where survey's flaws included a low number of respondents, the failure to address whether respondents were representative of people "whose potential confusion is relevant" and where the survey bore little similarity to the relevant real-world decision-making process). Other courts in the Circuit, however, have exercised their discretion to admit survey evidence despite methodological flaws. *See, e.g., Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.*, 221 F. Supp. 2d 457, 461 (S.D.N.Y. 2002) (admitting survey evidence where flaws, such as failure to offer standard translations of questions for non-English speaking respondents, "are not so obvious and egregious" that probative value is outweighed by prejudicial effect); *Caché, Inc. v. M.Z. Berger & Co.*, No. 99 Civ. 12320, 2001 WL 38283, at *10-11 (S.D.N.Y. Jan. 16, 2001).

[22] *See, e.g., Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 118-21 (3d Cir. 2004) (affirming district court's exclusion of survey evidence under Rules 702 and 403 in trademark infringement case where survey relied on an improper universe and its questions were vague and imprecise). *See id.* at 121 (stating that the court properly fulfilled its gatekeeping duty to exclude the survey where these flaws were deemed to be fatal rather than merely technical).

exclusions may seem large, that is more properly attributed to the number of experts proffered by the parties than to over-exclusion by the Special Masters. Subject only to the modifications set forth in this Opinion, the Special Masters' R&R is adopted and will be published as the Memorandum and Order of the Court.

## II.    BACKGROUND[23]

On March 16, 2007, defendant Dooney & Burke, Inc. ("Dooney & Burke") filed motions in limine to exclude the testimony and reports of plaintiff Louis Vuitton Malletier's ("Louis Vuitton" or "LV") experts:  Drs. Richard A. Holub, Eugene Ericksen, Jacob Jacoby, and Mr. West Anson.  On March 19, 2007, Louis Vuitton filed motions in limine to exclude the testimony and reports of Dooney & Burke's experts:  Drs. Robert N. Reitter and Bradford Cornell.

In light of the volume of the submissions on these motions, the Court appointed the Special Masters pursuant to Federal Rule of Civil Procedure 53(a)(1)(A) and (a)(1)(C) and by Order dated May 18, 2007 (the "May 18

---

[23]    Familiarity with the underlying facts of this litigation is assumed.  For a thorough discussion of the factual background, *see Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 340 F. Supp. 2d 415, 419-28 (S.D.N.Y. 2004), *vacated in part*, 454 F.3d 108 (2d Cir. 2006).

Order").[24]  Pursuant to the May 18 Order, the Special Masters were directed to

submit to the Court a collaborative R&R on the pending motions no later than

thirty days from May 18, 2007.[25]  On June 15, 2007, the Special Masters issued an

extensive R&R spanning one hundred and ninety-two pages.

On July 5, 2007, Louis Vuitton objected to the R&R on the ground

that the Special Masters had erred in excluding in their entirety the testimony and

reports of its three survey experts.[26]  Louis Vuitton also objected to the exclusion,

in part, of the testimony and report of its damages expert.  Dooney & Bourke

moved to adopt the R&R as to five of the six experts at issue, and conditionally

objected to the exclusion of its survey expert's report and testimony on the level of

consumer confusion in late 2006, as well as the exclusion of his trademark dilution

study.[27]

---

[24]     *See* Order Appointing and Directing Special Masters (the "May 18 Order").

[25]     *See id.* ¶ 2.

[26]     *See* Objections of Plaintiff Louis Vuitton Malletier to the Report & Recommendation of the Special Masters Dated June 15, 2007.

[27]     *See* Memorandum in Support of Dooney & Bourke's Motion to Adopt the R&R of the Special Masters (And Conditional Objections) ("Def. Mem.") at 17-25.  Dooney & Bourke states that their objections are "only made should the Court grant an objection or motion for modification from [Louis Vuitton]; if the Court should deny all of [Louis Vuitton]'s objections, [Dooney & Bourke] withdraws its conditional objection[s]." *Id.* at 2.

## III.   APPLICABLE LAW

### A.   Federal Rule of Civil Procedure 53

Pursuant to Rule 53(g)(1), "in acting on a [special] master's order, the court must afford an opportunity [for the parties] to be heard and may receive evidence, and may:  adopt or affirm; modify; wholly or partly reject or reverse; or resubmit to the master with instructions."[28]  As set forth in the May 18 Order and consistent with Rule 53(g)(3)-(4), the Court reviews de novo all objections to conclusions of law made or recommended by the Special Masters.[29]  All findings of fact made by the Special Masters are reviewed by the Court for clear error.[30]  Any rulings made by the Special Masters on procedural matters are to be set aside only if the Court finds an abuse of discretion.[31]

### B.   Admission of Expert Testimony

The proponent of expert evidence must establish admissibility under Rule 104(a) of the Federal Rules of Evidence by a "preponderance of proof."[32]

---

[28]   Fed. R. Civ. P. 53(g)(1).

[29]   *See* May 18 Order at ¶ 8(A).  *See also* Fed R. Civ. P. 53(g)(4).

[30]   *See* May 18 Order at ¶ 8(B).  *See also* Fed. R. Civ. P. 53(g)(3).

[31]   *See* May 18 Order at ¶ 8(C).  *See also* Fed. R. Civ. P. 53(g)(5).

[32]   *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987).  *See also Velez v. Sony Discos*, No. 05 Civ. 0615, 2007 WL 120686, at *4 (S.D.N.Y. Jan.

Rule 702 of the Federal Rules of Evidence states the following requirements for

the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact
> in issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.[33]

Under Rule 702 and *Daubert*, the trial judge must determine whether the proposed

testimony "both rests on a reliable foundation and is relevant to the task at hand."[34]

A district court must act as "a gatekeeper to exclude invalid and unreliable expert

testimony."[35] In doing so, the court's focus must be on the principles and

methodologies underlying the expert's conclusions, rather than on the conclusions

themselves.[36]

Expert testimony may not usurp the role of the court in determining

---

16, 2007) ("[T]he proponents of the [expert] Report[] bear the initial burden of
demonstrating the admissibility of the testimony.").

[33]     Fed. R. Evid. 702.

[34]     509 U.S. at 597.

[35]     *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999)
(quotation omitted).

[36]     *See Daubert*, 509 U.S. at 595.

the applicable law.[37]  Although an expert "may opine on an issue of fact," an

expert "may not give testimony stating ultimate legal conclusions based on those

facts."[38]  Expert testimony is inadmissible when it addresses "lay matters which

[the trier of fact] is capable of understanding and deciding without the expert's

help."[39]

In addition, Rule 403 states that relevant evidence "may be excluded

if its probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury."[40]  "Expert evidence can be both

powerful and quite misleading because of the difficulty in evaluating it.  Because

of this risk, the judge in weighing possible prejudice against probative force under

Rule 403 . . . exercises more control over experts than over lay witnesses."[41]

---

[37]     *See United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999).

[38]     *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).
*Accord Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in
accord with other circuits in requiring exclusion of expert testimony that expresses
a legal conclusion.").

[39]     *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir.
1989) (citing cases).

[40]     Fed. R. Evid. 403.

[41]     *Daubert*, 509 U.S. at 595 (quotation omitted).

## IV.  DISCUSSION

As an initial matter, I address Louis Vuitton's argument that Special Master Beebe's previously undisclosed interactions with a former Dooney & Bourke attorney, Jeremy Sheff – who continues to practice with counsel for defendant but is no longer involved with the instant litigation – warrants his disqualification and the "disregard[] in its entirety"[42] of the R&R.  By letter dated July 6, 2007, Louis Vuitton informed the Court of its "recent[] discover[y]"[43] that, in 2006, Special Master Beebe had commented on a draft of Sheff's legal article on trademark law and dilution, but had failed to disclose this prior to his appointment.[44]  Louis Vuitton contends that Special Master Beebe's "prior relationship" with a Dooney & Bourke attorney and their "collaboration on a project specifically regarding trademark law and dilution" constitute material facts that should have been disclosed prior to his appointment.[45]  According to Louis Vuitton, Special Master Beebe's failure to disclose the "relationship" has created an appearance of impropriety that casts doubt on the impartiality of the R&R,

---

[42]  7/6/07 Letter from Theodore C. Max, LV's counsel, to the Court at 3.

[43]  *Id.* at 1.

[44]  *See id.* at 1-3.

[45]  *Id.* at 2.

particularly in light of the R&R's "heavy weight in Dooney [& Bourke]'s favor."[46]

Dooney & Bourke acknowledges that Special Master Beebe and Sheff made contact, but disputes the existence of any "relationship" that might warrant disqualification or the wholesale disregard of the R&R.[47] Dooney & Bourke states that Sheff "has not had any responsibility" in its representation since May 2005, and was not aware of Special Master Beebe's appointment in this action.[48] Moreover, no Dooney & Bourke attorney was aware that Sheff had contacted Special Master Beebe for comments on a draft law review article in the past, nor did they know that Sheff had later thanked Special Master Beebe in the final version of that article.[49]

By letter dated July 11, 2007, Special Master Beebe informed the Court that in August 2006, at Sheff's initiative, the two had briefly corresponded

---

[46]    *Id.*

[47]    *See* 7/10/07 Letter from Douglas D. Broadwater, Dooney & Bourke's counsel, to the Court at 1, 3.

[48]    *Id.* at 2.

[49]    *See id.* at 3. Dooney & Bourke also notes that it could have objected to Special Master Beebe's appointment on the ground that he had thanked Louis Vuitton's survey expert, Dr. Jacob Jacoby, in a law review article published in 2006, and had once referred to him as a leading expert in his field. According to Dooney & Bourke, this constitutes a far more legitimate claim of bias, yet it never "asserted such a claim because it would not have passed the good faith test."

13

regarding Sheff's legal article on issues of trademark law as well as the legal market for professorships.[50] Special Master Beebe confirms that he has never met or spoken with Sheff, and that his limited review of Sheff's article and the correspondence itself stemmed from his duties as part of Cardozo Law School's Hiring Committee, as well as his own sense of obligation as "a member of the legal academic community."[51] Special Master Beebe further wrote that he does not recall Sheff's paper, and is not aware of Sheff's current employment situation.[52]

Under Rule 53(a)(2), a special master "must not have a relationship to the parties, counsel, action, or court that would require disqualification of a judge under 28 U.S.C. § 455 ("section 455") unless the parties consent with the court's approval to appointment . . . after disclosure of any potential grounds for disqualification."[53] Section 455(a) requires a judge's disqualification "in any

---

[50]    *See* 7/11/07 Letter from Special Master Beebe to the Court ("Special Master Beebe Letter") at 1-2. Sheff also emailed Special Master Beebe in June 2007 regarding the legal market for professors, but had not received a response as of the date of Special Master Beebe's letter to the Court. *See id.* at 2.

[51]    *Id.* at 2.

[52]    *See id.*

[53]    Fed. R. Civ. P. 53(a)(2).

proceeding in which his impartiality might reasonably be questioned."[54] The Second Circuit has stated that section 455(a) "sets out an objective standard for recusal,"[55] that is, "'whether an objective, disinterested observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt that justice would be done in the case.'"[56] Section 455(b)(1) requires the disqualification of a judge "[w]here he has personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."[57]

Section 455 neither requires the disqualification of Special Master Beebe nor the disregard of the R&R. The Court's review of the correspondence between Special Master Beebe and Sheff confirms that their "connection" was isolated, brief, and limited to the discussion of Sheff's draft article and the legal market for professorships. The fact that the article's subject matter is also trademark law and dilution is unremarkable given that Special Master Beebe

---

[54]    28 U.S.C. § 455(a).

[55]    *DeLuca v. Long Island Lighting Co., Inc.*, 862 F.2d 427, 428 (2d Cir. 1988).

[56]    *Id.* at 428-29 (quoting *Pepsico, Inc. v. McMillen*, 764 F.2d 458, 460 (7th Cir. 1985)).

[57]    28 U.S.C. § 455(b)(1).

specializes in intellectual property law. As such, it follows that his comments in that area of law are frequently solicited. Significantly, at no point in their brief correspondence did Sheff mention the instant litigation, his law firm's representation of Dooney & Bourke, or his own prior participation in that representation.[58] Considering the facts underlying the request to disqualify Special Master Beebe, no objective observer "would entertain a significant doubt that justice would be done in the case"[59] or that the closely-reasoned and well-supported R&R should be wholesale rejected. Moreover, disqualification is not warranted under section 455(b)(1) as Louis Vuitton has offered absolutely no facts to demonstrate that Special Master Beebe harbors a "personal bias or prejudice concerning a party" or has "personal knowledge of disputed evidentiary facts" regarding this action.[60]

Indeed, courts in this circuit have held that section 455 does not require disqualification or recusal in far closer cases.[61] While the pre-

---

[58]    *See* 8/16/06 - 8/20/06 Email Correspondence Between Special Master Beebe and Jeremy Sheff Esq., attached to Special Master Beebe Letter.

[59]    *DeLuca*, 862 F.2d at 428.

[60]    28 U.S.C. § 455(b)(1).

[61]    *See, e.g., Faulkner v. National Geographic Soc., et al.*, 296 F. Supp. 2d 488 (S.D.N.Y. 2003) (denying plaintiff's request for recusal where judge once represented a subsidiary of a minor defendant in an unrelated matter, and where

appointment disclosure of any such interactions are ideal, I am confident that this

particular disclosure would not have precluded Special Master Beebe's

appointment had it been disclosed at the outset.[62] For the foregoing reasons, Louis

Vuitton's motion to disqualify Special Master Beebe and to disregard the R&R is

denied.

### A.  Plaintiff's Experts

#### 1.  Dr. Eugene Ericksen

Dr. Eugene Ericksen "conducted a hybrid consumer confusion and

trademark dilution survey for Louis Vuitton between December 6, 2006 and

---

judge's former law firm colleague served as board member for main defendant during their colleagueship), *aff'd*, 409 F.3d 26 (2d Cir. 2005); *Local 338, RWDSU v. Trade Fair Supermarkets*, 455 F. Supp. 2d 143 (E.D.N.Y. 2006) (denying defendant's request for recusal under section 455(a) where plaintiff's counsel's father was an acquaintance and fellow partner at the judge's former law firm, and her mother briefly worked with the judge in the past in connection with a discrete matter). *Cf. McMillen*, 764 F.2d at 460-61 (granting petition for writ of mandamus directing recusal of judge where appearance of impropriety was created when judge's agent mistakenly contacted law firms, representing parties in pending action, regarding judge's possible future employment at those firms).

[62]   Notably, in advancing its argument for disqualification, plaintiff cites Special Master Beebe's "anti-trademark protection views" and "the pro-Dooney nature of the R&R" as further grounds for disqualification. 7/16/07 Letter from Michael A. Grow, Esq., defendant's counsel, to the Court at 2. The former criticism is more properly raised prior to the appointment of a special master, while the latter is merely sour grapes – in any dispute, one side loses and one side wins. This is not a ground for disqualification.

December 31, 2006 ([the] 'Ericksen Survey')."[63] The Special Masters recommended the exclusion of the Ericksen Survey in its entirety under Federal Rules of Evidence 403 and 702 due to the cumulative effect of a number of flaws. These flaws include the use of an improper stimulus, the poor choice of a control bag, the failure to instruct respondents against guessing, the improper classification of respondents, as well as other significant methodological errors.[64] Moreover, with respect to the trademark dilution component of the Ericksen Survey, the Special Masters found that Dr. Ericksen's analysis was plagued by the same methodological flaws present in the confusion component, and also "proceeds from a fundamental misunderstanding of the theory of dilution by blurring,"[65] improperly conflating it with consumer confusion.[66]

Finding no clear error in the Special Masters' factual findings and reviewing their legal conclusions de novo, I adopt the Special Masters' recommendation that Dr. Ericksen's report and testimony be excluded in their entirety under Rules 702 and 403. The cumulative effect of the flaws outlined in

---

[63]    R&R at 12.

[64]    *See id.* at 29-41.

[65]    *Id.* at 42.

[66]    *See id.* at 44.

18

the R&R render the report and testimony unreliable, and any probative value is substantially outweighed by the danger of unfair prejudice and misleading the jury.

## 2. Dr. Jacob Jacoby

Dr. Jacob Jacoby was retained by Louis Vuitton to conduct a trademark confusion survey (the "Jacoby Confusion Survey") and a dilution survey (the "Jacoby Dilution Survey"), both of which have been discussed by this Court in a prior opinion.[67] As I have previously noted and as the Special Masters have also found, the "Jacoby Confusion Survey [Report] does not, in fact, describe the actual survey that was undertaken."[68] The Special Masters found that the facts strongly suggest that the Jacoby Confusion Survey was "not reported in an accurate manner and . . . was not conducted in an objective manner,"[69] and is therefore not reliable under Rule 702. The Special Masters also found significant flaws in the survey including the improper definition of its universe,[70] the use of a

---

[67]  *See id.* at 45.  *See also Louis Vuitton*, 340 F. Supp. 2d at 442-45, 449-51.

[68]  R&R at 49.  *See also Louis Vuitton*, 340 F. Supp. 2d at 444.

[69]  R&R at 50.

[70]  *See id.* at 51-52.

survey question that asked respondents for a legal conclusion,[71] and the improper

classification of certain respondents as confused "based on factors not relevant to

the marks at issue."[72]

In addition, the Special Masters found numerous, fundamental

deficiencies in the Jacoby Dilution Study such as a lack of fit between the survey's

questions and the law of dilution,[73] the improper coding and classification of

several responses to the survey thus resulting in an "overstate[ment] of the number

of respondents who were 'diluted,'"[74] and the unexplained inconsistency between

the results of Dr. Jacoby's pilot dilution study, which found "little to no net

dilution"[75] and the subsequent survey which found dilution.

Finding no clear error in the Special Masters' factual findings and

reviewing their legal conclusions de novo, I adopt the Special Masters'

recommendation that Dr. Jacoby's report and testimony be excluded in their

---

[71]    *See id.* at 54 ("Indeed, the question [of whether defendant required permission or a license from plaintiff] asked the respondents the very question that this litigation seeks to answer.").

[72]    *Id.*

[73]    *See id.* at 62-65.

[74]    *Id.* at 67.

[75]    *Louis Vuitton*, 340 F. Supp. 2d at 451 n. 196. *See also* R&R at 67-68.

entirety under Rules 702 and 403. In considering the cumulative effect of the numerous flaws identified by the Special Masters, it is clear that Dr. Jacoby's report and testimony on the issues of both trademark confusion and dilution are unreliable. Moreover, any probative value is substantially outweighed by the danger of unfair prejudice and misleading the jury.

### 3. Dr. Richard A. Holub

Dr. Richard Holub was retained by Louis Vuitton "to study and compare the use of color in the multicolor handbags of Dooney & Bourke and Louis Vuitton."[76] Specifically, Louis Vuitton offers Dr. Holub's testimony "for two purposes: (1) to prove the likelihood of confusion presented by Dooney [& Bourke]'s multicolor logo; and (2) to prove Dooney [& Bourke]'s willful intent to copy the Louis Vuitton Multicolore Monogram mark."[77] The Special Masters recommended that Dr. Holub's report and testimony be excluded in their entirety.

With respect to the first purpose, the Special Masters concluded that Dr. Holub's highly technical report and testimony on the similarity of colors between the parties' handbags would not be helpful to the jury because the jury members can observe for themselves whether Dooney & Bourke's mark is

---

[76]     R&R at 118.

[77]     *Id.* at 122.

21

confusingly similar to Louis Vuitton's Multicolore Monogram mark.[78] The jury

can make that determination without the help of an expert and certainly without

the expert's "digital photography . . . technical jargon and colorimeter

approximation."[79] Finding no clear error in the Special Masters' factual findings

and reviewing their legal conclusions de novo, I adopt the Special Masters'

recommendation that Dr. Holub's report and testimony should be excluded to the

extent they are offered for the purpose of proving the likelihood of confusion.

 With respect to Dr. Holub's report and testimony offered for the

purpose of proving intent to copy, the Special Masters noted that this presented a

closer question[80] as "Dooney & Bourke's intent is potentially important in this

case because, among other things, Louis Vuitton is seeking an accounting of

Dooney & Bourke's profits, and such an accounting is possible only upon a

finding of willful intent on Dooney & Bourke's part."[81] Further, with respect to

---

[78]  *See id.* at 126-27. *See also Price v. Fox Entm't Group, Inc., et al.*, 499 F. Supp. 2d 382, 389 (S.D.N.Y. 2007) (holding expert testimony on probative similarities between works is unnecessary where the works are not highly technical and the "jury is capable of recognizing and understanding the similarities between the works without the help of an expert").

[79]  R&R at 127.

[80]  *See id.* at 191 n. 355.

[81]  *Id.* at 131 (citing *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 500 F. Supp. 2d 276, 282, 283 (S.D.N.Y. 2007)).

damages, if Louis Vuitton can establish that Dooney & Bourke's actions were intentionally deceptive, that gives rise to a rebuttable presumption of confusion.[82] Indeed, the Special Masters recognized the potential probative value of Dr. Holub's testimony on the issue of intent, noting "while it is true that Dooney & Bourke would not be liable for using even the same exact colors as Louis Vuitton . . . , it is also true that evidence of copying the colors is at least probative of an intent to copy the Louis Vuitton mark itself."[83] Accordingly, the Special Masters stated that "on the question of intent[,] it could be helpful for the jurors to know exactly how much of the pallette was used in each mark, and the exact extent to which the colors used by Dooney & Bourke overlap with the colors used by Louis Vuitton."[84] "If Dooney & Bourke chose identical or very similar color combinations as were chosen by Louis Vuitton, that fact at least tends to prove an intent to infringe on Louis Vuitton's mark."[85]

Ultimately, however, the Special Masters concluded the risk is too

---

[82]    *See Louis Vuitton*, 500 F. Supp. 2d at 279 n.8 (citing *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992)). *See also* R&R at 133.

[83]    R&R at 132.

[84]    *Id.* at 135-36.

[85]    *Id.* at 137.

great that the jury may be influenced by Dr. Holub's testimony and improperly use it toward resolving the likelihood of confusion issue, even if instructed by the Court to consider it only for the issue of intent.[86]  Moreover, according to the Special Masters, the probative value of expert testimony on the overlapping colors, even on the intent issue, is diminished by the fact that the colors are not themselves the mark that Louis Vuitton seeks to protect.[87]  Additionally, the similarity between the colors may be supported by inferences other than an intent to copy, such as fashion trends.[88]

There is no clear error in the Special Masters' factual findings. Reviewing their legal conclusions de novo, however, I hold that Dr. Holub's testimony and report are admissible for the purpose of proving intent.  Dr. Holub, however, may only testify to the extent of the overlapping use of colors in the Dooney & Bourke and Louis Vuitton multicolored monogram handbags.[89]  In doing so, I adopt the Special Masters' suggestion that, should the Court allow Dr.

---

[86]      *See id.* at 136-38 ("The risk that Dr. Holub's opinions will usurp the jury's decisionmaking on the question of likelihood of confusion substantially outweighs the attenuated probative value of similar color choice when offered only to prove intent to copy Louis Vuitton's mark.").

[87]      *See id.* at 137.

[88]      *See id.*

[89]      *See id.* at 132-33.

Holub to testify on intent, he should "not be permitted to testify that his findings *in fact* indicated that Dooney & Bourke intentionally copied Louis Vuitton's colors."[90]

Although I recognize that there is a risk that the jury "may take [Dr. Holub's] testimony [on the intent issue] as an instruction on how to decide the question of likelihood of confusion,"[91] that risk can be minimized by a limiting instruction.[92] In fact, although the Special Masters ultimately rejected this approach, they did note that the risk of prejudice and confusion posed by Dr. Holub's testimony may be "lessened somewhat by a limiting instruction."[93] This Court has routinely relied upon limiting instructions to "remind[] the jury of its role and of the limits of expert testimony [and] clarify the extent of their consideration of such testimony."[94] Further, the Second Circuit has recognized a

---

[90] *Id.* at 132.

[91] *Id.* at 136.

[92] *See id.*

[93] *Id.*

[94] *Hnot v. Willis Group Holdings Ltd.*, No. 01 Civ. 6558, 2007 WL 1599154, at *3 (S.D.N.Y. June 1, 2007) (citing *United States v. Snype*, 441 F.3d 119, 130 (2d Cir. 2006)).

"strong presumption that juries follow limiting instructions."[95] With respect to the factors that the Special Masters found to diminish the testimony's probative value, including the fact that the mark at issue consists of more than just colors, as well as inferences that may support color overlap other than intent to copy, those are relatively minor and can be addressed on cross-examination and opening and closing statements.

The probative value of Dr. Holub's report and testimony, limited to the overlap of colors between the Louis Vuitton and Dooney & Bourke marks, is not substantially outweighed by the dangers of unfair prejudice or confusing the jury. As a result, I will allow limited testimony by Dr. Holub.

### 4. Mr. Weston Anson

Mr. Weston Anson was retained by Louis Vuitton to review financial documents and accounting information produced by Dooney & Bourke during the course of discovery and "to prove the amount of net profit that Dooney & Bourke derived from its assumed infringement on the Louis Vuitton Multicolore [Monogram] mark; and [] to prove that Louis Vuitton suffered dilution of its

---

[95]     *Snype*, 441 F.3d at 130 (citing *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993)).

26

Multicolore Monogram mark as a result of Dooney & Bourke's infringement."[96] The Special Masters recommended that Mr. Anson's report and testimony be excluded but for his testimony on the "amount of net profits that Dooney & Bourke obtained from the allegedly infringing sales."[97]

Mr. Anson's method of calculating net profits deducted only those costs directly incurred in the production of the allegedly infringing Dooney & Bourke handbags, but did not deduct a proportionate amount of general expenses such as overhead.[98] Because the deduction of general expenses is required only if defendant can prove the connection between those expenses and the sales of the allegedly infringing items, the Special Masters qualified their recommendation to permit Mr. Anson's testimony.[99] Specifically, they recommended that Mr. Anson be permitted to testify to his calculation of Dooney & Bourke's net profits, but only if Dooney & Bourke is unable to connect any general expenses to the sales generating those profits.[100] If, however, Dooney & Bourke is able to do so, then

---

[96]  R&R at 142.

[97]  *Id.* at 172.

[98]  *See id.* at 147-48.

[99]  *See id.* at 150-51.

[100]  *See id.* at 151.

Mr. Anson's testimony must be adjusted to reflect the deduction.[101]

The Special Masters found that Mr. Anson's dilution study does not "fit" with the substantive law of dilution because he "does not purport to connect a loss of sales [by Louis Vuitton] in the United States to a loss of reputation on the part of Louis Vuitton."[102] The Special Masters further found that Louis Vuitton had failed to cite any case "to support the proposition that a plaintiff's loss of sales coincident with a defendant's achieve[ment of a] 'critical mass' in the marketplace necessarily implies a loss of reputation."[103] Moreover, the Special Masters identified a number of flaws in the dilution study. Chief among those flaws is a lack of fit between the basic premise of the study – *i.e.*, that Louis Vuitton suffered a loss of sales in the United States resulting from Dooney & Bourke's marketing efforts – and Louis Vuitton's oft-expressed position in this litigation – *i.e.*, that it does not claim lost profits.[104] The Special Masters also found Mr. Anson's

---

[101]    *See id.* at 151-52. The Special Masters further noted that Dooney & Bourke's burden of connecting general expenses to the sales of the allegedly infringing items must be met at trial before the jury. *See id.* at 152.

[102]    *Id.* at 162.

[103]    *Id.* at 162-63.

[104]    *See id.* at 158-60 (citing Objections and Responses to Interrogatory No. 17, Further Amended Response to Dooney & Bourke's Third Set of Interrogatories).

opinion "that there is a statistically significant difference between sales of [Louis Vuitton's] handbags in the United States and the rest of the world . . . ." to be unreliable under Rule 702 due to his complete reliance on another expert who has not been produced in this action.[105] The Special Masters concluded that Mr. Anson's testimony on dilution constitutes "nothing but conduit testimony from an expert on a matter outside his field of expertise."[106]

Finding no clear error in the Special Masters' factual findings and reviewing their legal conclusions de novo, I adopt the Special Masters' recommendation that Mr. Anson's report and testimony be admitted in part and excluded in part, as set forth above, under Rules 702 and 403. In light of the number of serious flaws that plague Mr. Anson's report and testimony, specifically on the issue of dilution, the probative value is substantially outweighed by the prejudicial effect and the serious potential to mislead the jury.

## B.    Defendant's Experts

### 1.    Dr. Bradford Cornell

I find no clear error in the Special Masters' factual findings with respect to Dr. Bradford Cornell's testimony and report on the issue of Louis

---

[105]    *See id.* at 163-68.

[106]    *Id.* at 167.

Vuitton's damages and Dooney & Bourke's profits, and come to the same legal conclusions upon a de novo review. For those reasons and because neither party objects to the adoption of the R&R with respect to Dr. Cornell,[107] I adopt the Special Masters' recommendation and allow his testimony and report subject to the limitations set forth in the R&R.

### 2. Dr. Robert N. Reitter

Dr. Robert N. Reitter was retained by Dooney & Bourke to conduct a trademark confusion survey and trademark recognition survey in 2004.[108] Both surveys have been previously discussed by the Court.[109] In 2006, Dr. Reitter was once again commissioned to conduct a second trademark confusion survey and a dilution survey.[110] The Special Masters recommended that Dr. Reitter's reports and testimony on all of these surveys be excluded in their entirety.

Dooney & Bourke "does not challenge the Special Masters' recommendation with respect to the 2004 [trademark confusion survey] or with the

---

[107] *See* Def. Mem. at 16-17.

[108] *See* R&R at 68.

[109] *See Louis Vuitton*, 340 F. Supp. 2d at 445-46, 439 n. 124.

[110] *See* R&R at 68.

30

efforts to revive it"[111] through the 2006 confusion survey. Rather, Dooney &
Bourke objects on the ground that the Special Masters considered the 2006
confusion survey solely as a means to revive the 2004 confusion survey previously
criticized by the Court.[112] As such, Dooney & Bourke contends that the Special
Masters failed to regard the 2006 confusion survey, standing alone, "as an
independent study that found *de minimis* confusion as of late 2006"[113] –
specifically, November and December 2006.[114]

Although the Special Masters primarily regarded the 2006 confusion
survey as a response to the Court's criticisms of the 2004 survey, the Special
Masters did conduct a careful analysis of the 2006 confusion survey, independent
of the 2004 survey. In doing so, the Special Masters identified a number of flaws
in the methodology of the 2006 confusion survey and explicitly noted that the
2006 survey "suffers from some of the same methodological flaws that beset the
2004 survey."[115] These flaws include: inappropriate selection of non-upscale

---

[111]    Def. Mem. at 19.

[112]    *See id.*

[113]    *Id.*

[114]    *See id.* at 21.

[115]    R&R at 104.

malls for the survey; a low screening standard for respondents; a "far from ideal"[116] sampling method that precluded within-location comparisons among respondents who were exposed to the control bag versus Dooney & Bourke bags with name hangtags versus Dooney & Bourke bags without name hangtags;[117] the low number of respondents participating in the survey;[118] and the failure to employ a methodology involving sequential presentation or "line-up" of stimuli which better approximates marketplace conditions.[119]

　　While the Special Masters remarked that each methodological flaw, standing alone, may not mandate exclusion, each flaw diminished the 2006 confusion survey's reliability and probative value.[120]  Although a survey

---

[116]　　*Id.*

[117]　　*See id.* at 84 ("Instead, all respondents at a given mall location were either exposed to bags bearing the name sign or to bags not bearing the name sign" or to the control bag).

[118]　　*See id.* at 105-06.

[119]　　*See id.* at 106-07 ("Thus a survey that purports to approach market conditions pertinent to the substantive standard of likelihood of confusion should try to take account of the possibility of sequential viewing."). *See also Louis Vuitton*, 454 F.3d at 117 (similarity of the marks to be assessed "when viewed sequentially in the context of the marketplace").

[120]　　*See* R&R at 104-05 ("Reitter's sampling method, insofar as it precludes within-location comparison, diminishes the reliability and probative value of the 2006 [c]onfusion [s]urvey – though it is not the kind of fundamental error that would mandate exclusion on its own"). *See also id.* at 106 ("The low

measuring the level of consumer confusion in late 2006 is of some probative value, the cumulative effect of the methodological flaws identified by the Special Masters so diminishes the reliability and probative value of the 2006 confusion survey that its exclusion is warranted under Rules 403 and 702.

With respect to Dr. Reitter's dilution study conducted in 2006, the Special Masters recommended that it be excluded in its entirety because "as designed, it could provide no reliable indication of whether the [Louis Vuitton] Multicolore mark was diluted."[121] Finding that Dr. Reitter's dilution study "'reveals little except that there is a high consumer recognition of the Louis Vuitton Monogram Multicolore marks'" and failed to measure dilution,[122] the Special Masters recommended exclusion under Rules 702 and 403. Specifically, they concluded that Dr. Reitter failed to "preclude the possibility that . . . the recognition level of the Louis Vuitton Multicolore [m]ark might have been higher

---

number of respondents is one more factor that diminishes the reliability and probative value of the 2006 Reitter [c]onfusion [s]urvey"); *id.* at 107 ("The use of the 'Eveready' method of presentation – at least its exclusive use – diminishes the reliability and probative value of the survey and correspondingly raises the risk of jury confusion and prejudice.").

[121]    R&R at 72.

[122]    *Id.* at 113 (quoting *Louis Vuitton*, 340 F. Supp. 2d at 451).

but for the existence in the marketplace of Dooney & Bourke It-Bags."[123] As such,

it was conducted pursuant to "fundamentally flawed"[124] reasoning that rendered it

irrelevant to the dilution question and inadmissible. In addition, the Special

Masters addressed other flaws that do not, standing alone, require exclusion but

"quell[] any doubt about [the study's] exclusion."[125] These flaws include the

improper grouping of handbags in the study, which failed to simulate market

conditions,[126] and the failure to utilize follow-up questions to prompt respondents

to explain their answers.[127]

Taken cumulatively, the methodological flaws identified by the

Special Masters and the "fundamentally flawed reasoning"[128] of the Reitter

dilution study warrant its exclusion. Dooney & Bourke objects to the Special

---

[123]   *Id.* at 114.

[124]   *Id.*

[125]   *Id.* at 116.

[126]   *See id.* ("[T]he flawed presentation adds to the case for
inadmissibility – so even if the misguided nature of the enterprise were not enough
to exclude the [d]ilution [s]urvey, the flaw in presentation quells any doubts about
its exclusion.").

[127]   *See id.* at 118 (stating that although the failure to ask follow-up
questions is a methodological flaw that does not, on its own, warrant exclusion, "it
does add strength to the case for exclusion . . . .").

[128]   *Id.* at 114.

Masters' recommended exclusion on the ground that "surely it is 'relevant' to know how strong the claimed mark is as a source-identifier . . . ."[129] But the study's conclusion that the Louis Vuitton Multicolore Monogram mark is still very strong does not address whether it has been diluted – rather, it speaks more to the strength of the mark itself and its fame, neither of which are disputed. To admit it as a "dilution" study poses a real threat of unfair prejudice and of misleading the jury. Rather than "set[ting] too high a bar for what evidence is 'relevant,'" as Dooney & Bourke contends,[130] the Special Masters properly found that the Reitter dilution study "casts no light" on the issue of dilution and amounts to an "ad hoc use of a new theory of testing dilution"[131] that is unreliable. Finding no clear error in the Special Masters' factual findings and reviewing their legal conclusions de novo, I adopt the Special Masters' recommendation that Dr. Reitter's report and testimony, including the 2006 confusion study and the dilution study, be excluded in their entirety.

## V.  CONCLUSION

For the reasons stated above, plaintiff's motions are granted in part

---

[129]     Def. Mem. at 24.

[130]     *Id.*

[131]     R&R at 114.

and denied in part, and defendant's motions are denied. The Clerk of the Court is directed to close the following motions: [Docket Entry Nos. 188, 194, 199, 204, 206]. A teleconference is scheduled for December 21, 2007, at 11:45 a.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           December 13, 2007

**- Appearances -**

**For Plaintiff:**
Steven Kimelman, Esq.
Michael A. Grow, Esq.
Alison Arden Besunder, Esq.
Arent Fox LLP
1675 Broadway
New York, NY 10019
(212) 484-3900

Theodore C. Max, Esq.
Sheppard Mullin Richter & Hampton LLP
30 Rockefeller Plaza, 24th Floor
New York, NY 10112
(212) 332-2800

**For Defendant:**

Douglas D. Broadwater, Esq.
Roger G. Brooks, Esq.
Darin P. McAtee, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Thomas J. McAndrew, Esq.
Thomas J. McAndrew & Associates
One Turks Head Place, Ste. 205
Providence, RI 02903
(410) 455-0350