**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
              :

**LOUIS VUITTON MALLETIER,**   :

              :

         **Plaintiff,**   :

              :       **<u>OPINION AND ORDER</u>**

   - against -        :

              :       **04 Civ. 2990 (SAS)**

**DOONEY & BOURKE, INC.,**   :

              :

         **Defendant.**   :

              :
-------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

       This action has pitted two prominent handbag manufacturers against each other and mired them in seemingly endless and often contentious litigation for nearly four years. Plaintiff Louis Vuitton Malletier ("Louis Vuitton") claims that defendant Dooney & Bourke, Inc. ("Dooney & Bourke" or "Dooney") violated federal and state law by introducing and selling handbags bearing designs that infringe upon and dilute Louis Vuitton's trademark rights. Following the conclusion of extensive fact and expert discovery, Dooney & Bourke now seeks to end the case by moving for summary judgment on all of Louis Vuitton's claims. For the reasons that follow, defendant's motion is granted in its entirety.

## II. BACKGROUND

### A. Facts[1]

#### 1. The Parties

Louis Vuitton designs, manufactures, imports, and sells fine apparel, handbags, luggage, and fashion accessories.[2] It maintains its principal place of business in Paris, France and employs more than ten thousand people both directly and through its subsidiaries and affiliates.[3]

Dooney & Bourke designs, manufacturers and sells quality handbags and fashion accessories.[4] It was founded in 1975, and maintains its principal place

---

[1]     For a thorough discussion of the factual background, see *Louis Vuitton Malletier v. Dooney & Bourke, Inc. (Vuitton I)*, 340 F. Supp. 2d 415, 419-28 (S.D.N.Y. 2004), *vacated in part*, 454 F.3d 108 (2d Cir. 2006) (*Vuitton II*). The facts in this section are not in dispute, and are drawn from Defendant's Local Rule 56.1 Statement ("Def. 56.1"), Plaintiff's Local Rule 56.1 Counterstatement of Material Facts ("Pl. Counter 56.1"), and Defendant's Amended Response to Certain Responses in Plaintiff's Local Rule 56.1 Counterstatement ("Def. Response 56.1"). The Court notes that defendant's Local Rule 56.1 Statement is shamefully long, totaling almost three hundred facts – many of which are legal conclusions and non-binding findings of fact from the preliminary injunction stage. Similarly, plaintiff's counter-statement is comprised of needlessly long responses to those purported facts, and denials based on painfully thin distinctions. Indeed, the immature posturing that both parties have exhibited throughout this litigation is evident even in their Local Rule 56.1 statements.

[2]     *See* Def. 56.1 ¶ 6.

[3]     *See id.* ¶ 7.

[4]     *See id.* ¶ 2.

2

of business in Connecticut.[5] Peter Dooney serves as the company's president and chief designer, and he bears final authority over all of the Dooney & Bourke product designs.[6]

## 2. The Handbag Designs

At its Fall 2003 fashion show held on October 7, 2002, Louis Vuitton introduced handbags bearing a new design.[7] This design consisted of Louis Vuitton's original, registered Toile Monogram trademark – *i.e.*, entwined "LV" initials with a curved diamond with a four-point star inset, its negative, and a circle with a four-leafed flower inset[8] – newly set in thirty-three colors (the "Murakami colors")[9] arranged on a white or black background (collectively, the "Monogram Multicolore mark").[10] Both the "L" and the "V" in a single "LV" monogram bear the same Murakami color.[11] Although the letters comprising each

---

[5]     *See id.* ¶¶ 1-2.

[6]     *See id.* ¶ 3.

[7]     *See id.* ¶ 11.

[8]     *See id.* ¶¶ 8-10.

[9]     These colors include red, orange, yellow, green, blue, violet, pink, black, white, brown, and gray. *See id.* ¶ 96.

[10]     *See id.* ¶¶ 12-13. *See also* Def. Response 56.1 ¶ 11.

[11]     *See, e.g.*, Four Views of One Handbag Bearing Monogram Multicolore Mark, Ex. L to Declaration of Charles A. LeGrand ("LeGrand Decl."),

monogram are the same color, the colors vary from monogram to monogram.[12] Additionally, both of the letters in a single monogram face in the same direction, as well as all of the "LV" monograms on any given side of a handbag.[13] To the extent that zippers appear on the exterior of a handbag from the Monogram Multicolore line, those zippers are uncolored.[14]

Louis Vuitton's new design, which is not registered with the U.S. Patent and Trademark Office, was the product of a collaboration between its designers and the Japanese artist Takashi Murakami.[15] Soon after the introduction of handbags bearing the Monogram Multicolore mark in October 2002, fashionista customers began contacting Louis Vuitton to pre-order the handbags.[16] Due to the great amount of interest generated by the Monogram Multicolore mark, Louis Vuitton decided to make the line of handbag and accessories bearing the mark a permanent addition to its collection.[17] By March 2003, handbags bearing the

---

plaintiff's co-counsel, at L-12.

[12] *See, e.g., id.*

[13] *See, e.g., id.*

[14] *See* Def. 56.1 ¶ 116.

[15] *See id.* ¶¶ 12, 17.

[16] *See id.* ¶ 21.

[17] *See* Pl. Counter 56.1 ¶ 15.

4

Monogram Multicolore mark with the white background began arriving in Louis Vuitton's retail stores.[18] Handbags with the black background were distributed for retail sale in July 2003.[19] Due to the handbags' popularity, there were waiting lists for certain products at times during 2003 and 2004.[20]

The price range for handbags and fashion accessories bearing the Monogram Multicolore mark range from less than one hundred and fifty dollars for a simple mirror case to thousands of dollars for certain handbags.[21] As of late 2006, products bearing the Monogram Multicolore mark have sold over 186,600 units in the United States,[22] resulting in total sales as of November 2006 of almost $145 million.[23]

Dooney & Bourke has sold a line of products, including handbags, known as the "Signature Collection" since 2001.[24] This line features a repeated

---

[18]    *See* Def. 56.1 ¶ 21.

[19]    *See id.*

[20]    *See id.* ¶ 275.

[21]    *See, e.g.*, Photographs and Prices of Sample Louis Vuitton Monogram Multicolore Products, Ex. J to LeGrand Decl., at J-01.

[22]    *See* Def. 56.1 ¶¶ 45, 71.

[23]    *See id.* ¶ 73.

[24]    *See id.* ¶ 23.

pattern of an interlocking "DB" monogram alternating forwards and backwards across the surface of the product.[25] The "DB" monogram is a registered trademark.[26]

In 2003, D&B introduced its "It Bag" line of handbags, small leather goods, and accessories.[27] The "It Bag" line bears a design featuring the "DB" monogram that appears in the "Signature Collection" but set in nine colors on a white background, and the "DB" monogram printed in seven colors on a black background.[28] The individual "D" and "B" in a single "DB" monogram bear colors different from each other and both letters face in the same direction.[29] Each monogram faces in an opposite direction from the monogram immediately beside it. Additionally, the "DB" monograms alternate between a "DB" facing to the

---

[25] *See id.* ¶ 24.

[26] *See id.* ¶ 26. *See also* Trademark Reg. No. 2,771,012, Ex. O to Declaration of Jessica L. Selb, defendant's counsel, in Support of Dooney & Bourke's Motion for Summary Judgment ("Selb Decl."), at O-1.

[27] *See* Def. 56.1 ¶ 34.

[28] *See id.* ¶¶ 29, 97.

[29] *See, e.g.*, Swatch of Dooney & Bourke Monogram on White Background ("Dooney Swatch"), Ex. C to LeGrand Decl., at C-10. *See also* Photograph of Dooney & Bourke Round Backpack, Ex. J to Selb Decl., at J-13. For photographs of examples of Louis Vuitton and Dooney & Bourke handbags bearing the marks at issue, see *Vuitton I*, 340 F. Supp. 2d at 422-23.

right side with the "D" on top and the interlocked "B" on the bottom, and a "DB" facing to the left side (*i.e.*, the mirror image of a standard "D" and "B") with the "B" on top and the interlocked "D" on the bottom.[30]

The "It Bag" line does not feature any additional graphics or shapes other than the colored monograms on a white or black background.[31] To the extent that zippers appear on the exterior of an "It Bag" product, those zippers are multi-colored.[32] The "It Bag" line of products also features a pink enameled heart with the words "Dooney & Bourke" written in gold script and hanging from certain handbags.[33]

Products featuring the colored monogram on a white background began to be sold in retail stores in July 2003, and those with the black background were sold beginning in October 2003.[34] The "It Bag" line of products range in price from less than fifty dollars to hundreds of dollars, and in general, are less

---

[30]     *See, e.g.*, Dooney Swatch.

[31]     *See, e.g.*, *id.*

[32]     *See* Def. 56.1 ¶ 115. *See also* Def. Response 56.1 ¶ 115.

[33]     *See* Def. 56.1 ¶ 106. *See also* Photographs and Prices of Sample Dooney & Bourke "It Bag" Products ("Defendant's Sample of Dooney & Bourke Products"), Ex. K to Selb Decl., at K-1, K-5-K-9.

[34]     *See* Def. 56.1 ¶¶ 30-31.

7

expensive than Louis Vuitton products of similar size and shape.[35]

As of late 2006, more than 1.76 million products from the "It Bag" line have been sold in the United States.[36] The sales figures for those products have exceeded $100 million.[37]

## B.    Procedural Background

Louis Vuitton filed its complaint on April 19, 2004, alleging trademark infringement under section 32 of the Lanham Act, unfair competition and false designation of origin under section 43(a) of the Lanham Act, and trademark dilution under the Federal Trademark Dilution Act of 1996 (the "FTDA").[38] Additionally, Louis Vuitton brought claims for trademark infringement and unfair competition under New York state law, and trademark dilution and injury to business reputation under section 360-1 of New York's General Business Law.

By motion dated April 30, 2004, Louis Vuitton moved to

---

[35]    *See, e.g.*, Defendant's Sample of Dooney & Bourke Products at K-1. *Accord* Photographs and Prices of Sample Dooney & Bourke "It Bag" Products, Ex. J to LeGrand Decl., at J-08.

[36]    *See* Def. 56.1 ¶ 70.

[37]    *See id.* ¶ 72.

[38]    *See* Complaint ¶ 1.

preliminarily enjoin Dooney & Bourke from infringing upon and diluting its trademark rights pending the final determination of the instant action. Following a seven-day hearing, the Court denied Louis Vuitton's motion in its entirety. By Opinion and Order dated August 27, 2004 (the "August 27, 2004 Opinion"), I denied injunctive relief on the trademark infringement claim because, despite the validity of the Monogram Multicolore mark, Louis Vuitton failed to demonstrate a likelihood of confusion "among consumers as to the source, authorization, or affiliation of Dooney & Bourke's handbags."[39] I denied injunctive relief on the federal dilution claim where Louis Vuitton had demonstrated the fame and inherent distinctiveness of its mark, but had failed to adequately demonstrate that it was likely to prove actual dilution.[40] Louis Vuitton appealed to the Second Circuit, and discovery proceeded while the appeal was pending.

The Second Circuit affirmed in part and vacated and remanded in part. With respect to the trademark infringement claim, it agreed with this Court that the Monogram Multicolore mark is both inherently distinctive and holds secondary meaning.[41] However, in assessing likelihood of confusion, the Second

---

[39]    *Vuitton I*, 340 F. Supp. 2d at 447.

[40]    *See id.* at 448-52.

[41]    *See Vuitton II*, 454 F.3d at 116.

9

Circuit held that this Court's utilization of a side-by-side comparison to determine

the similarity of the marks at issue was improper in light of the Circuit's decision

in an unrelated case, *Louis Vuitton Malletier v. Burlington Coat Factory*

*Warehouse Corp.*[42] Although the Circuit found no clear error otherwise with

respect to the Court's analysis of the trademark infringement claim, it vacated and

remanded for a reassessment of that claim.[43] The Second Circuit affirmed this

Court on the federal dilution claim, holding that Louis Vuitton had failed to offer

any evidence of actual dilution.[44]

By Opinion and Order dated April 27, 2007, I held that in order for

Louis Vuitton to recover Dooney & Bourke's profits should it prevail on its

federal trademark infringement claim, it must prove that Dooney & Bourke's

---

[42]     426 F.3d 532 (2d Cir. 2005). Notably, the Second Circuit
acknowledged that the decision was issued over a year after the August 27, 2004
Opinion and could not have been anticipated by this Court. *See Vuitton II*, 454
F.3d at 112.

[43]     Specifically, the Second Circuit instructed the Court to "consider the
precise trademark claimed by the plaintiff and whether, under market conditions
and when viewed sequentially, Vuitton can prove likelihood of confusion between
its Multicolore mark and the pattern of Dooney & Bourke's It-Bag." *Vuitton II*,
454 F.3d at 119-20. For similar reasons, the Second Circuit also vacated and
remanded the portions of the August 27, 2004 Opinion that addressed Louis
Vuitton's trademark infringement, unfair competition, and dilution claims under
New York law. *See id.* at 119.

[44]     *See id.* at 118-19.

10

infringing conduct was willfully deceitful.[45]  In the absence of such a showing,

Louis Vuitton would only be entitled to recover the amount of its own damages.[46]

Moreover, I held that Louis Vuitton's federal dilution claim, to the extent it seeks

damages, continues to be governed by the standard set forth in the FTDA rather

than its replacement – the Trademark Dilution Revision Act of 2006 (the

"TDRA").  As a result, Louis Vuitton cannot recover monetary damages absent a

showing of actual dilution.[47]

Following the close of extensive fact and expert discovery, both

parties moved in limine to exclude certain expert testimony and reports under

Federal Rules of Evidence 403 and 702, and *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*[48] and its progeny.  In light of the volume of submissions on

those motions, the Court appointed special masters with the parties' consent

---

[45]     *See Louis Vuitton Malletier v. Dooney & Bourke, Inc. ("Vuitton III")*,
500 F. Supp. 2d 276, 280-82 (S.D.N.Y. 2007).

[46]     *See id.* at 282 ("Unless Louis Vuitton has developed new proof of
Dooney & Bourke's willful deceit, the only monetary remedy to which Louis
Vuitton will be entitled, with respect to its infringement claim, are damages – not
Dooney & Bourke's profits.").

[47]     *See id.* at 282-83.  By Memorandum Opinion and Order dated May
22, 2007, I denied Louis Vuitton's motion for reconsideration and modification of
*Vuitton III*. *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, No. 04 Civ.
2990, 2007 WL 1498323 (S.D.N.Y. May 22, 2007).

[48]     509 U.S. 579 (1993).

pursuant to Federal Rule of Civil Procedure 53(a)(1)(A) and (a)(1)(C) and by
Order dated May 18, 2007. The special masters issued a Report &
Recommendation (the "R&R") and the parties objected to the Court's adoption of
various portions of the R&R. By Opinion and Order dated December 13, 2007, I
adopted the R&R subject to certain very limited modifications.[49] Dooney &
Bourke then filed the instant motion for summary judgment.

## III. APPLICABLE LAW

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and
disclosure materials on file, and any affidavits show that there is no genuine issue
as to any material fact and that the movant is entitled to judgment as a matter of
law."[50] An issue of fact is genuine "'if the evidence is such that a reasonable jury
could return a verdict for the nonmoving party.'"[51] A fact is material when it
"'might affect the outcome of the suit under the governing law.'"[52] "It is the

---

[49]     *See Louis Vuitton Malletier v. Dooney & Bourke, Inc. ("Vuitton IV")*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007).

[50]     Fed. R. Civ. P. 56(c).

[51]     *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[52]     *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir.
2007) (citing *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)).

12

movant's burden to show that no genuine factual dispute exists."[53]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, it must do more than show that there is "'some metaphysical doubt as to the material facts,'"[54] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[55] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[56]

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[57] However, "[i]t is a

---

[53]     *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[54]     *Higazy*, 505 F.3d at 169 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[55]     *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[56]     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).

[57]     *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007) (citing *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

13

settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[58] Summary judgment is therefore inappropriate "'if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party.'"[59]

## B.    Trademark Infringement Under the Lanham Act

Section 32(1) of the Lanham Act governs claims for infringement of a registered trademark, prohibiting the use in commerce of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive."[60]

Section 43(a) of the Act[61] governs claims for infringement of an unregistered trademark and also acts as "a broad federal unfair competition

---

[58]    *McClellan*, 439 F.3d at 144 (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). *Accord Anderson*, 477 U.S. at 249.

[59]    *American Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (quoting *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002)).

[60]    15 U.S.C. § 1114(1).

[61]    *See* 15 U.S.C. § 1125(a)(1)(A).

provision."[62]  Accordingly, "[w]here there is a claim of consumer confusion [as] to the association of a product or service with another person's trademark, the central inquiry is whether it is likely that 'an appreciable number of ordinarily prudent purchasers' will be misled as to the source or sponsorship of the product or service in question."[63]

"A claim of trademark infringement, whether brought under [section 32(1) or 43(a) of the Act], is analyzed under the familiar two-prong test . . . . The test looks first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods."[64]  A certificate of registration of plaintiff's trademark on the principal register is prima facie

---

[62]     *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002). Specifically, section 43(a) prohibits the use in commerce of "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a)(1)(A).

[63]     *Chambers*, 282 F.3d at 155 (quoting *EMI Catalogue P'ship v. Hill, Holiday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 61-62 (2d Cir. 2000)).

[64]     *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (citing *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072 (2d Cir. 1993) and *Time, Inc. v. Petersen Publ'g Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir. 1999)).  *Accord Vuitton II*, 454 F.3d at 115.

evidence that plaintiff's mark satisfies the first prong of the test.[65]

In order to determine whether a defendant's use of a mark is likely to cause consumer confusion, courts in the Second Circuit typically engage in a weighing analysis using the eight *Polaroid* factors set out by Judge Henry Friendly, which are: (1) the strength of plaintiff's mark; (2) the similarity of plaintiff's and defendant's marks; (3) the proximity of the products; (4) the likelihood that plaintiff will "bridge the gap;" (5) actual confusion between products; (6) defendant's good or bad faith in adopting the mark; (7) the quality of defendant's product; and (8) the sophistication of the buyers.[66] However, "[n]o single factor is dispositive, nor is a court limited to consideration of only these factors."[67] "Further, 'each factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the

---

[65] *See* 15 U.S.C. § 1057(b) ("A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce . . . .").

[66] *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).

[67] *Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 130 (2d Cir. 2004) (citing *Polaroid*, 287 F.2d at 495).

product.'"[68] The Second Circuit has also noted that "the court may in some circumstances grant summary judgment even without considering all of the *Polaroid* factors."[69]

"The likelihood-of-confusion inquiry turns on whether 'numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark.'"[70] "To support a finding of infringement, there must be a 'probability of confusion, not a mere possibility.'"[71] "This standard does not change on summary judgment."[72]

"If a factual inference must be drawn to arrive at a particular finding on a *Polaroid* factor, and if a reasonable trier of fact could reach a different conclusion, the district court may not properly resolve that issue on summary

---

[68]     *Id.* (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir. 1986)).

[69]     *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 167 (2d Cir. 2004) (citation omitted).

[70]     *Id.* at 161 (quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 477-78 (2d Cir. 1996)).

[71]     *Id.* (quoting *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 121 (2d Cir. 2001)).

[72]     *Id.*

judgment."[73] As such, summary judgment should only be granted "where the undisputed evidence would lead only to one conclusion as to whether confusion is likely."[74]

## C.   Trademark Dilution Under the Lanham Act

Under the FTDA, "the owner of a famous trademark [can] seek 'an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark.'"[75] Whereas an action for trademark infringement "serves the interests of consumers, as well as sellers, in having trademarks function as source-identifiers," a dilution claim exists "*solely* for the benefit of sellers. Its purpose is to protect the owners of famous marks from the kind of dilution that is permitted by the trademark laws when a junior user uses the

---

[73]   *Cadbury Beverages*, 73 F.3d at 478.

[74]   *Id.*

[75]   *New York Stock Exch., Inc. v. New York, New York Hotel, LLC*, 293 F.3d 550, 557 (2d Cir. 2002) (quoting 15 U.S.C. § 1125(c)(1)). The FTDA provides, in relevant part, that: "The owner of a famous mark shall be entitled . . . to an injunction against another person's commercial use . . . of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark . . . ."

same mark in a non-confusing way in an unrelated area of commerce."[76] Dilution

ordinarily applies where the parties do not operate in competitive or closely related

product lines, but the FTDA "on its face is capable of application to competitive

situations."[77]

To prevail under the FTDA, a mark's owner must show that: "(1) the

senior mark [is] famous; [and] (2) distinctive; (3) the junior use [is] a commercial

use in commerce; (4) it [] begin[s] after the senior mark has become famous; and

(5) [] cause[s] dilution of the distinctive quality of the senior mark."[78] Because a

famous mark can be protected under the FTDA *without* a showing of confusion,

---

[76]    *TCPIP Holding Co. v. Haar Commc'ns*, 244 F.3d 88, 95 (2d Cir. 2001) (emphasis added). *See also id.* ("The [FTDA] offers no benefit to the consumer public – only to the owner.").

[77]    J. Thomas McCarthy, 4 *McCarthy on Trademarks and Unfair Competition* § 24:72 (4th ed. 2008). McCarthy opines that "[i]t is difficult to understand why an anti-dilution law is invoked when the parties operate in competitive or closely related product or service lines. The legal theory of anti-dilution was conceived to protect strong marks against a diluting use by a junior users in a product or service line far removed from that in which the famous mark appears. Thus, using the anti-dilution law when the parties are competitors in the same market sounds a dissonant and false note. Why the need to invoke the 'super weapon' of anti-dilution law to resolve what appears to be a garden variety infringement case."). *But see Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 219 (2d Cir. 1999) ("While the antidilution statutes aim at a different harm than the infringement statute . . . we see no reason why dilution cannot occur . . . where the products are competing."), *abrogated on other grounds*, *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 433 (2003).

[78]    *Nabisco*, 191 F.3d at 215.

"the standard for fame and distinctiveness required to obtain anti-dilution protection is more rigorous than that required to seek infringement protection."[79] It is not enough for a trademark holder to show that the mark has acquired secondary meaning. Rather, the plaintiff must demonstrate that the mark is *inherently distinctive* to prevail under the FTDA.[80]

A "plaintiff must show that the senior mark possesses both a significant degree of *inherent* distinctiveness and . . . a high degree of . . . *acquired* distinctiveness."[81] In general, the "'degree of fame required for protection under the FTDA must exist in the general marketplace, not in a niche market. Thus, fame limited to a particular channel of trade, segment of industry or service, or geographic region is not sufficient to meet that standard.'"[82]

A plaintiff must next demonstrate the existence of *actual* dilution,

---

[79]     *Empresa Cubana del Tabaco v. Culbro Corp.*, No. 97 Civ. 8399, 2004 WL 602295, at \*33 (S.D.N.Y. Mar. 26, 2004) (quotation marks and citation omitted).

[80]     *See New York Stock Exch.*, 293 F.3d at 556-57.

[81]     *Savin Corp. v. Savin Group*, 391 F.3d 439, 449 (2d Cir. 2004) (quotation marks omitted) (emphasis in original).

[82]     *Id.* at 450 n.6 (quoting *Christopher D. Smithers Found., Inc. v. St. Luke's-Roosevelt Hosp. Ctr.*, 00 Civ. 5502, 2003 WL 115234, at \*5-6 (S.D.N.Y. Jan. 13, 2003)).

although it need not prove actual loss of sales or profits.[83] The Supreme Court has explained:

> [W]here the marks at issue are not identical, the mere fact that consumers mentally associate the junior user's mark with a famous mark is not sufficient to establish actionable dilution . . . . [S]uch mental association will not necessarily reduce the capacity of the famous mark to identify the goods of its owner . . . .[84]

In 2006, Congress enacted the TDRA, which replaced the FTDA in its entirety.[85] Under the TDRA, a trademark owner must still demonstrate that its mark is famous or "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."[86] While the TDRA reconfigured the factors used by courts to evaluate

---

[83]

> The Supreme Court [in *Moseley*] in essence made it more difficult for dilution claims to succeed because plaintiffs face a much higher hurdle of demonstrating actual dilution, but the Court was silent as to the manner in which courts must evaluate plaintiffs' success in overcoming that hurdle. This silence could imply that a test designed to measure likelihood of dilution may not be appropriate to evaluate actual dilution, but we are left without firm guidance on the issue.

*AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 804 (6th Cir. 2004).

[84]      *Moseley*, 537 U.S. at 433.

[85]      *See* Pub. L. No. 109-312, 120 Stat. 1730 (2006).

[86]      15 U.S.C. § 1125(c)(2)(A).

fame, the "Second Circuit's requirement that 'the senior mark [must] be truly famous before a court will afford the owner of the mark the vast protections of the FTDA' remains unchanged . . . ."[87]

The TDRA also provides the owner of a famous mark with injunctive relief.[88] In addition to injunctive relief, the TDRA permits the recovery of monetary damages on a federal dilution claim where the owner of a famous mark establishes a likelihood of dilution.[89] The TDRA thus relaxed the burden of proof required to obtain monetary relief since the FTDA had required the owner to establish actual dilution. This relaxed standard, however, applies only if the mark "that is likely to cause dilution . . . was first used in commerce by the person against whom the injunction is sought *after October 6, 2006* . . . ."[90]

---

[87]    *Dan-Foam A/S v. Brand Name Beds, LLC*, 500 F. Supp. 2d 296, 307 n.90 (S.D.N.Y. 2007) (quoting *Savin Corp.*, 391 F.3d at 449).

[88]    15 U.S.C. § 1125(c)(5) ("[T]he owner of a famous mark shall be entitled to injunctive relief as set forth in section 1116 of this title."). Section 1116 empowers courts to "grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title." *Id.* § 1116.

[89]    *See id.* § 1125(c)(5).

[90]    *Id.* (emphasis added). *Accord Dan-Foam A/S*, 500 F. Supp. 2d at 308 ("Because the TDRA's relaxed likelihood of dilution standard applies only to pre-October 6, 2006 claims seeking prospective relief, actual dilution . . . still applies

### D.    State Law Claims

#### 1.    Trademark Infringement and Unfair Competition

"The elements necessary to prevail on common law causes of action for trademark infringement 'mirror the Lanham Act claims.'"[91] A claim of unfair competition under New York law also requires evidence of defendant's bad faith.[92]

#### 2.    Trademark Dilution Under Section 360-1 of the New York General Business Law

Under New York General Business law, a "[l]ikelihood of . . . dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief . . . notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."[93]  To prevail on a claim under section 360-1 of the New York General Business Law, *first*, the plaintiff's trademark must be distinctive and *second*, the plaintiff must

---

when a pre-October 6, 2006 claimant seeks monetary relief.").

[91]    *Vuitton I*, 340 F. Supp. 2d at 436 (quoting *TCPIP Holding Co. v. Haar Commc'ns*, No. 99 Civ. 1825, 2004 WL 1620950, at *6 n.5 (S.D.N.Y. July 19, 2004)). *Accord Cartier Int'l B.V. v. Ben-Menachem*, No. 06 Civ. 3917, 2008 WL 64005, at *13 (S.D.N.Y. Jan. 3, 2008) ("The same acts that constitute trademark counterfeiting and unfair competition under federal laws give rise to [p]laintiffs' claims of common law trademark infringement and unfair competition, as well as unfair competition under New York law.").

[92]    *See Vuitton I*, 340 F. Supp. 2d at 436.

[93]    N.Y. Gen. Bus. Law § 360-1.

show a likelihood of dilution.[94]

With respect to the first element, "[d]istinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes."[95] "New York law accords protection against dilution to marks that are distinctive as a result of acquired secondary meaning as well as to those that are inherently distinctive."[96] Dilution under the second element can involve blurring or tarnishment.[97] "'To determine the likelihood of blurring, [courts look] to six factors, including: (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; (vi) the renown of the junior mark.'"[98]

## IV.  DISCUSSION

As an initial matter, the parties dispute whether the findings of fact and conclusions of law reached by the Court at the preliminary injunction stage

---

[94]    *See Vuitton I*, 340 F. Supp. 2d at 436.

[95]    *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030 (2d Cir. 1989) (citations omitted).

[96]    *New York Stock Exch.*, 293 F.3d at 557 (citation omitted).

[97]    *See id.* (citation omitted).

[98]    *Vuitton I*, 340 F. Supp. 2d at 437 (quoting *New York Stock Exch.*, 293 F.3d at 558).

are relevant to the resolution of the instant motion. Louis Vuitton contends that Dooney & Bourke's references in its Local Rule 56.1 statement to those findings and conclusions are improper because the standard governing summary judgment is distinguishable from the standard on a motion to preliminarily enjoin activity.

Louis Vuitton is correct that the Court's findings of fact and conclusions of law made on a motion for preliminary injunction are not binding on the Court when deciding a motion for summary judgment. This is because the "parties are held to different standards of proof in preliminary injunction hearings than in motions for summary judgment and because findings of fact at the preliminary injunction stage are not as fully fleshed out as at the summary judgment stage . . . ."[99]

Although Dooney & Bourke is correct that the Court may consider those findings and conclusions on a summary judgment motion,[100] its proffer of statements made in the August 27, 2004 Opinion as undisputed facts is not

_____

[99] *DeSmeth v. Samsung Am.*, No. 92 Civ. 3710, 1998 WL 315469, at *2 (S.D.N.Y. June 16, 1998).

[100] *See Lanvin, Inc. v. Colonia, Inc.*, 776 F. Supp. 125, 127 (S.D.N.Y. 1991) (stating that "[i]n determining a motion for summary judgment, we may consider the Court's findings of fact and conclusions of law in a prior motion for preliminary injunction. However, those earlier findings are not binding . . . .").

helpful.[101] Even if Louis Vuitton does not dispute that those statements were once made, the Court must still conduct an independent inquiry based on the record, as it currently stands, to determine whether judgment can be granted as a matter of law.

## A. Trademark Infringement Under the Lanham Act

After nearly four years of litigation, the parties continue to dispute the exact contours of the Monogram Multicolore mark. Specifically, in its Counterstatement of Material Facts pursuant to Local Rule 56.1, Louis Vuitton now claims that the Monogram Multicolore mark consists of "elements of the original Toile Monogram [t]rademark . . . thirty-three colors arranged and displayed with regularly spaced intervals in horizontal and diagonal rows, in a repeating fashion, on a white [] or a black background []."[102] This definition marginally expands the scope of the Monogram Multicolore mark, as originally

---

[101] *See, e.g.*, Def. 56.1 ¶ 130 ("[T]here is absolutely no proof that Dooney & Bourke attempted to deceive consumers. *Vuitton [I]*, 340 F. Supp. 2d at 447, *aff'd*, *Vuitton [II]*, 454 F.3d at 118."). The Court is obviously aware of its own findings in 2004. Dooney & Bourke's citation to those findings in its Local Rule 56.1 statement was a waste of time, paper, and this Court's limited resources.

[102] *See, e.g.*, Pl. Counter 56.1 ¶ 18. *See also* Def. Response 56.1 ¶ 11 ("The cited evidence does not demonstrate that the [Monogram] Multicolore mark is 'colors arranged and displayed with regularly spaced intervals' in 'horizontal rows in a repeating fashion,' as LV now states . . . .").

defined. However, because Louis Vuitton has consistently defined the Monogram Multicolore mark, up until now, as the Toile Monogram trademark in the thirty-three Murakami colors set against the white or black background,[103] I continue to use that definition here.

The first prong of the test for trademark infringement requires that the Monogram Multicolore mark be entitled to protection. The Second Circuit has previously held that the mark is protectable under section 43(a) of the Lanham Act because it is inherently distinctive, and it has acquired secondary meaning.[104] Despite Louis Vuitton's assertion that "a genuine issue of fact exists on this important [] factor,"[105] nowhere does Dooney & Bourke actually dispute that the Monogram Multicolore mark is a valid mark entitled to protection. In the absence of any dispute on this prong, and because it is well-established based on ample evidence that the mark is inherently distinctive, and has acquired secondary

---

[103]    *See, e.g., Vuitton II*, 454 F.3d at 115 ("Vuitton claims a new trademark, currently unregistered, consisting of a design plus color, that is, the traditional Vuitton Toile pattern design – entwined LV initials with the three already described motifs – displayed in the 33 Murakami colors and printed on a white or black background.").

[104]    *See id.* at 116.

[105]    Plaintiff Louis Vuitton Malletier's Memorandum of Law in Opposition to Defendant Dooney & Bourke, Inc.'s Motion for Summary Judgment ("Pl. Opp.") at 13.

meaning, there is no genuine issue of material fact on this prong.

The outcome of plaintiff's trademark infringement claim thus turns on the likelihood-of-confusion inquiry. I focus primarily on the *Polaroid* factors for which the parties dispute whether genuine issues of material fact remain.[106] The crux of Dooney & Bourke's motion for summary judgment on the trademark infringement claim is that Louis Vuitton has failed to put forth evidence demonstrating likelihood of confusion despite the fact that the allegedly infringing "It Bags" have been sold for four years.[107] According to Dooney & Bourke, "confusion has never occurred in the real world despite colossal sales of both products,"[108] and therefore there is no genuine issue of material fact as to whether

---

[106]     It is "incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why." *Natural Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 579 (2d Cir. 2005) (quotation marks omitted). The parties agree that the fourth *Polaroid* factor of "the likelihood that plaintiff will bridge the gap" is not an issue here and need not be considered. *See* Pl. Opp. at 14 n.5; Dooney & Bourke's Memorandum of Law in Support of its Motion for Summary Judgment ("Def. Mem.") at 13 n.11. Dooney & Bourke contends that even if the remaining two *Polaroid* factors – "the strength of plaintiff's mark" and "the proximity of the products" – weigh in Louis Vuitton's favor, "the outcome of the *Polaroid* analysis on likelihood of confusion must still favor" Dooney & Bourke. Def. Mem. at 13 n.11. Because there is no genuine issue of material fact as to either factor, both *Polaroid* factors weigh in Louis Vuitton's favor.

[107]     Def. Mem. at 3-13.

[108]     Dooney & Bourke's Reply Memorandum of Law in Further Support of its Motion for Summary Judgment at 1.

consumers are likely to be confused. Louis Vuitton contends that because a reasonable juror could find that the design featured on Dooney & Bourke's "It Bags" is likely to cause confusion, summary judgment is precluded.[109]

### 1. The Second *Polaroid* Factor: Similarity Between Plaintiff's and Defendant's Marks

In considering similarity, courts must assess whether the "overall impression" created by the marks at issue in relation to the "context in which they are found" is likely to confuse prospective customers.[110] Because the Second Circuit has made clear that "market conditions must be examined closely to see whether the differences between the marks are 'likely to be memorable enough to dispel confusion on serial viewing,'"[111] the Court has carefully considered all of the evidence in the record with this guidance in mind. Based on that review, I hold that plaintiff has offered no proof that the similarity in the marks is likely to confuse ordinary consumers, whether it is at the point of initial interest, point-of-sale, or post-sale, and the differences between the marks are "likely to be

---

[109]   *See* Pl. Opp. at 13.

[110]   *Gruner + Jahr*, 991 F.2d at 1079.

[111]   *Vuitton II*, 454 F.3d at 118 (quoting *Burlington Coat Factory*, 426 F.3d at 538).

memorable enough to dispel confusion" even under market conditions.[112]

As I have previously observed, there are obvious similarities between the products bearing the marks at issue. Most notably, both the Louis Vuitton and Dooney & Bourke handbags feature multicolored monograms set against a white or black background. In market as well as social settings, consumers would likely view the handbags sequentially or serially rather than simultaneously, from a distance rather than at close-range, and subject to varying lighting conditions. Considering real-world conditions "is merely an application of the general rule that the job of a decision-maker is not to make a personal evaluation of the marks as shown on exhibits side-by-side in a brief or displayed in blown-up reproductions conveniently placed next to each other on easels in a courtroom."[113]

Even when viewed in market and social settings, from afar, and at

[112] *Id.* (quotation marks omitted). Louis Vuitton appears to claim only initial interest and post-sale confusion. Initial interest confusion is defined as "confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion." "[E]ven if the marks are almost identical, initial interest confusion is not assumed and must be proven by the evidence." 4 McCarthy § 23:6. Post-sale confusion "can occur when a manufacturer of knockoff goods offers consumers a cheap knockoff copy of the original manufacturer's more expensive product, thus allowing a buyer to acquire the prestige of owning what appears to be the more expensive product." *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 108 (2d Cir. 2000).

[113] 4 McCarthy § 23:58. *Accord Burlington Coat Factory*, 426 F.3d at 539.

30

different times, there are a number of key, discernible dissimilarities that preclude a finding that consumers would consider the marks confusingly similar. *First,* Louis Vuitton's Monogram Multicolore mark consists of its well-recognized, strong, and inherently distinctive Toile Monogram mark. Dooney & Bourke's "It Bags" prominently feature the "DB" registered trademark. Although the background color may be the same – either white or black – the monograms and their positioning on that background distinguish the products even when viewed "in public from a distance, in a store window, from across a room, from a passing car, [] while walking in the street,"[114] in an advertisement, or hanging off of a woman's shoulder, by way of examples.

The "LV" in the Monogram Multicolore mark is significantly larger in font size than Dooney & Bourke's "DB," and plaintiff's mark unmistakably includes three geometric shapes that are evenly interspersed across the design. In fact, the geometric shapes themselves constitute a significant portion of the design. Even when viewed in marketplace conditions, it is plainly discernible that the Monogram Multicolore mark is a combination of letters *and* shapes. In contrast, the design on Dooney & Bourke's "It Bags" is solely comprised of the "DB"

---

[114]     Declaration of Heather Vandenberghe, Vice President of Marketing and Communications for Louis Vuitton North America ("Vandenberghe Decl."), in Opposition to Dooney's Motion for Summary Judgment, ¶ 9.

monogram, without any other shapes whatsoever.

Second, the undisputed evidence shows that each monogram or shape that comprises the Louis Vuitton's Monogram Multicolore mark bears a single color. For example, both the "L" and the "V" that comprise a single "LV" monogram on a handbag are the same color. In contrast, the "D" and the "B" comprising a single "DB" monogram on a handbag bear different colors. The impressions created by the handbags' differing presentations of color are distinct as well as distinguishable. The color scheme on the Dooney & Bourke handbags creates a softer, unfocused effect, while the Monogram Multicolore mark presents crisp, bold, individual colors that appear more as a collection of distinct colors.

In light of the key dissimilarities between the marks at issue and the existence of defendant's prominent and registered trademark on the products bearing the allegedly infringing mark, the differences are "likely to be memorable enough to dispel confusion on serial viewing."[115] As a result, this factor favors defendant.

### 2. The Fifth *Polaroid* Factor: Actual Confusion Between the Products

Louis Vuitton asserts that two genuine issues of material fact on this

---

[115] *Burlington Coat Factory*, 426 F.3d at 538.

*Polaroid* factor remain in dispute: *first*, "[w]hether consumers have been confused by Dooney's marks, including as to whether products bearing them are Louis Vuitton products;" and *second*, "[w]hether the decline in Louis Vuitton's U.S. sales of products under its Monogram Multicolore [m]arks, versus the upward trend in the rest of the world where Dooney does not sell products, was the result of Dooney's use of multicolored monogram marks . . . that confused and diverted customers . . . ."[116] Louis Vuitton further contends that because it has obtained evidence of actual confusion since the Court's finding at the preliminary injunction stage this factor weighs in favor of defendant.

Dooney & Bourke argues that Louis Vuitton has still failed to produce any evidence that even a single consumer was actually confused about source or sponsorship of the "It Bags" during the past four years and instead continues to rely on previously-rejected evidence. It is well-established that Louis Vuitton need not show actual confusion in order to prevail on its claim, but "'[t]here can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion.'"[117] In order to prove actual confusion,

---

[116]    Plaintiff Louis Vuitton's Statement of Material Facts Precluding Summary Judgment ¶¶ 320-321.

[117]    *Savin Corp.*, 391 F.3d at 459 (quoting *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971)).

however, Louis Vuitton must put forth more than a "'single anecdote [] of confusion over the entire course of competition'" because de minimis evidence is insufficient to raise a triable issue.[118]

The evidence submitted both in support of and in opposition to the instant motion fails to raise a genuine issue of material fact as to actual confusion. The Second Circuit has made clear that "[i]f consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected . . . that can be a powerful indication that the junior trademark does not cause a meaningful likelihood of confusion."[119] It is undisputed that Louis Vuitton has sought evidence of consumer confusion generated by the sale of Dooney & Bourke's "It Bags" from 2003 through at least 2007.[120] Despite these efforts, Louis Vuitton continues to point to what amounts

---

[118] *Id.* (quoting *Nora Beverages*, 269 F.3d at 124) (finding that evidence of a single incident where "someone who had previously sold an exhibit to [d]efendants mistakenly concluded that one of [p]laintiff's executives was associated with [defendants]" constituted de minimis evidence of actual confusion, and weighing that factor in defendants' favor).

[119] *Nabisco*, 191 F.3d at 228. *See* 4 McCarthy § 23:18 ("Weight is given to a failure to prove instances of actual confusion only in instances where the relevant products have coexisted in the market for a long period of time. However, as the duration of non-confusing co-existence stretches into years, the force of the inference strengthens.") (quotation marks omitted).

[120] *See* Def. 56.1 ¶ 46.

to de minimis evidence of confusion – whether initial, reverse, or post-sale – particularly considering the number of years these products have been on the market and the volume of sales they have generated.[121] Indeed, at her November 2006 deposition, Louis Vuitton's director of intellectual property, Nathalie Moullé-Berteaux, testified that she had no recollection of any new incidents or examples of consumer confusion since the preliminary injunction hearing in 2004.[122]

A very generous reading of the declarations submitted by Louis Vuitton's sales associates and the email evidence reveals, at most, a de minimis number of instances of what might be considered actual consumer confusion. Rather, the vast majority of the evidence on actual confusion submitted by Louis Vuitton solely suggests that Dooney & Bourke's "It Bag" design may "call to mind" the Monogram Multicolore mark, or vice versa. As an example of actual confusion, Louis Vuitton's sales associate asserts that "in or about May 2005, a group of young girls were in the [Louis Vuitton] store . . . [o]ne . . . carried a multicolor Dooney & Bourke bag and while holding her bag close to the Louis

---

[121] Louis Vuitton's products bearing the Monogram Multicolore mark have now been on the market for more than four and a half years and, as of November 2006, have generated total sales of almost $145 million. *See id.* ¶ 73.

[122] *See id.* ¶ 50.

Vuitton multicolor display said . . . , 'Look, my bag looks almost identical to the Louis Vuitton!'"[123]  "[W]hile the junior user's mark may call to mind the senior user's famous mark, this alone is not sufficient for a likelihood of confusion."[124] Indeed, the "'very fact of calling to mind may indicate that the mind is distinguishing rather than being confused by the two marks.'"[125]

Here, Louis Vuitton's evidence actually demonstrates that despite the fact that one source's bag may remind some consumers of the bags of another source, consumers are generally aware that the two multi-colored and monogrammed designs come from different, unaffiliated sources which they were

---

[123]    *See* Declaration of Danika Quinones, retail sales associate for Louis Vuitton, Ex. K to Selb Decl., ¶ 4. *See also* Declaration of Annabelle Huynh, retail sales associate for Louis Vuitton, Ex. K to Selb Decl., ¶ 4 ("In or about the last two months, I assisted a female customer who was with another female customer and showed them a Louis Vuitton 'Eliza' bag.  The women said they did not like it because it looked just like the multicolor Dooney & Bourke bag one of the women was carrying.  The women said that Louis Vuitton copied Dooney & Bourke.").

[124]    4 McCarthy § 23:9 (citation omitted). *Compare Burlington Coat Factory*, 426 F.3d at 538 n.3 ("Even if a consumer can differentiate between two products, the question is whether, and to what degree, the look of the junior user's product calls to mind the senior user's product") *with Vuitton IV*, 525 F. Supp. 2d at 593-94 (noting that in *Burlington Coat Factory*, Louis Vuitton claimed trade dress infringement in addition to trademark infringement, and the "calls to mind" language from that opinion refers to the "look" or trade dress of a product, which the parties agree is not at issue in the instant case).

[125]    4 McCarthy § 23:9 (quoting *Application of Ferrero*, 479 F.2d 1395, 1397 (C.C.P.A. 1973)).

able to distinguish and identify by name. The fact that some consumers believed that Louis Vuitton copied Dooney & Bourke's design weighs in defendant's favor because it tends to show that consumers are not misled as to the source, sponsorship, or affiliation of Dooney & Bourke's products with Louis Vuitton. Indeed, they recognize that their products are distinct and originate from independent and unaffiliated sources.[126]

Even the testimony of Louis Vuitton's director of intellectual property suggests that Louis Vuitton's infringement claim is not necessarily premised on a likelihood of confusion between its products and those of defendant, but rather Louis Vuitton's distaste at being associated with the "It Bags."[127] The evidence, however, fails to demonstrate that this "association," which Louis Vuitton disdains, amounts to consumer confusion as to the sponsorship, affiliation, or connection between the marks at issue. Moreover, the

---

[126]    *See id.* § 24:69 ("Traditional trademark infringement involves mistakenly connecting similar marks with the same source or an affiliate source. Similar marks: one source.").

[127]    *See* 11/15/06 Deposition of Nathalie Moullé-Berteaux, plaintiff's director of intellectual property, Ex. C to Selb Decl., at 101:5-8, 101:24-102:2 (Defendant's counsel: "So you think [Louis Vuitton] has good grounds to claim of [sic] infringement if people simply think of Louis Vuitton but don't believe these [*i.e.*, Dooney & Bourke "It Bags"] are Louis Vuitton bags; correct?" [Objections omitted] Witness: "Okay. What I am saying is making association with [ – ] it is whether or not they are likely to be confused.").

extremely scant number of instances on which Louis Vuitton relies as evidence of consumer confusion as to sponsorship or affiliation constitutes de mimimis evidence that is insufficient to raise a triable issue of material fact.[128]

Because so little of Louis Vuitton's evidence indicates any confusion as to source, sponsorship, or affiliation between the products of plaintiff and defendant, no reasonable juror could find that actual confusion exists. This factor, therefore, weighs in defendant's favor.[129]

### 3. The Sixth *Polaroid* Factor: Defendant's Good or Bad Faith in Adopting the Mark

The crux of Dooney & Bourke's argument here is that because this Court has previously found no proof of willful deceit in Dooney's adoption of its

---

[128] *See Louis Vuitton Malletier v. Burlington Coat Factory*, No. 06 Civ. 2540, 2007 WL 627453, at *2 (S.D.N.Y. Jan. 18, 2007) ("In applying the *Polaroid* factors during resolution of the parties' claims at a trial on the merits, the [] [c]ourt should consider not only the potential for consumer confusion as to the *source* of the marks in question, but [] also . . . the potential for confusion as to the sponsorship, affiliation, connection, or identification of those marks.") (quotation marks omitted) (emphasis in original).

[129] *See, e.g., Atlantic Richfield Co. v. Arcos Global Int'l Co.*, No. 95 Civ. 6361, 1997 WL 607488, at *8 (S.D.N.Y. May 29, 1997) (dismissing plaintiff's complaint and directing entry of judgment in favor of defendants where, inter alia, plaintiff failed to show any meaningful instances of actual confusion in support of this *Polaroid* factor, and stating that "isolated instances of confusion, especially by unidentified individuals after the commencement of litigation, is insufficient to establish a likelihood of confusion").

mark and because Louis Vuitton has failed to produce any probative evidence since then, this factor continues to weigh in defendant's favor. Louis Vuitton argues that genuine issues of material fact exist with respect to this factor, including, inter alia, "whether [Peter] Dooney preselected the infringing marks and used the 'It Team' as a smokescreen to deceive the public," and "whether Dooney created false waiting lists to confuse the public into associating its bags with those sold under the Monogram Multicolore [m]arks . . . ."[130]

In support of its opposition, Louis Vuitton has also submitted the report of its expert, Dr. Richard A. Holub, on the overlapping use of colors in the marks at issue, and for the limited purpose of proving defendant's intent to copy. Dr. Holub testified that six of the seven colors used by Dooney & Bourke on its black bags and seven of the nine colors used on the white bags are "very similar" to the corresponding colors on Louis Vuitton's bags.[131] He further testified that this overlap in colors is striking – and Louis Vuitton argues that this speaks to Dooney's intent – because Dooney could have chosen from thousands of distinct colors for its monogram design.[132]

---

[130]    Pl. Opp. at 19.

[131]    Declaration of Richard A. Holub ¶ 13.

[132]    *See id.* ¶ 17.

The Second Circuit has suggested that evidence on this *Polaroid* factor is insufficient when it solely demonstrates that a defendant was aware of a plaintiff's marks before proceeding to use its own modified version.[133]  Where there is "no evidence that the [defendant] acted in bad faith in any sense relevant to the Lanham Act, that is, by deceiving customers into believing that its products [] were related to" the plaintiff, this factor favors defendant.[134]  While the evidence proffered by Louis Vuitton on this factor is not necessarily convincing, a jury could conclude that the discrepancies, however minor, in testimony regarding the genesis of the "It Bags" coupled with the expert testimony on the proximity between Dooney's color palette and the Murakami colors suggest that Peter Dooney was aware of the Monogram Multicolore mark and may have imitated or been inspired by certain "design features" or the look of products bearing the mark.[135]  However, there continues to be no proof that Dooney & Bourke acted in bad faith or attempted to deceive consumers in any way relevant to the Lanham Act.

---

[133]   *See New York Stock Exch.*, 293 F.3d at 556 n.1.

[134]   *Id.*

[135]   Pl. Opp. at 20.

### 4. The Seventh *Polaroid* Factor:  The Quality of Defendant's Product

According to Dooney & Bourke, there is no serious dispute that both parties' products are generally considered to be of high quality and regard.[136]  The Second Circuit has observed, however, that a "marked difference in quality . . . actually tends to reduce the likelihood of confusion . . . because buyers will be less likely to assume that the senior user whose product is high-quality will have produced the lesser-quality products of the junior user."[137]  Louis Vuitton does not allege that Dooney & Bourke's products are inferior, nor is there any evidence in the record substantiating the high or low quality of defendant's products relative to those of plaintiff.  As a result, this factor is neutral as a matter of law.

### 5. The Eighth *Polaroid* Factor:  The Sophistication of the Buyers

Dooney & Bourke contends that consumers who purchase its handbags and those of Louis Vuitton are sophisticated about brand identity.  Therefore, according to Dooney & Bourke, this factor weighs in its favor because discerning consumers are less likely to be confused about source, sponsorship, or affiliation.  "If the goods are expensive, the reasonably prudent buyer does not buy

---

[136]  *See* Def. Mem. at 12-13.

[137]  *Savin Corp.*, 391 F.3d at 461.

casually, but only after careful consideration. Thus, confusion is less likely than where the goods are cheap and bought casually."[138]

Louis Vuitton argues that "the significance of this factor depends on the circumstances and the nature of the confusion at issue" because the sophistication of direct purchasers has no effect on post-sale confusion.[139] Moreover, according to Louis Vuitton, Dooney & Bourke's "It Bags" were targeted at consumers who are teenagers and are presumptively not sophisticated.

It cannot be reasonably disputed that consumers of products offered by both Louis Vuitton and Dooney & Bourke are sophisticated and discerning. Moreover, while Louis Vuitton's handbags are, on average, more costly than those sold by Dooney & Bourke, the evidence shows that there is an overlap among consumers of both brands.[140]

This factor slightly favors Dooney & Bourke. On the one hand,

---

[138]     4 McCarthy § 23:96 (citation omitted).

[139]     Pl. Opp. at 22-23 (citing *T. Anthony, Ltd. v. Louis Vuitton Malletier*, 30 U.S.P.Q.2d 1214, 1218 (S.D.N.Y. 1993)).

[140]     *See, e.g.*, 1/27/04 Email to Dooney & Bourke, Ex. K to LeGrand Decl., at K-02 ("I was going to buy a Dooney [&] Bourke "It" style bag with the proceeds of my handbags but instead I will purchase a Coach or a Louis Vuitton."). *Accord* 9/9/06 Email from "Mark and Paula" to Dooney & Bourke, Ex. K to LeGrand Decl., at K-10 ("Even though this is an old style and I have several other Dooney/Coach/Burberry and Louis Vuitton purses[,] this is one of my favorites and I would like to get it done as soon as possible.").

consumers of quality, expensive handbags – made by Louis Vuitton, Dooney &
Bourke, and other high-end brands – tend to be sophisticated, hyper fashion-
conscious, and are not likely to be easily confused regardless of their youth. On
the other hand, Louis Vuitton alleges, inter alia, post-sale confusion and the
sophistication of direct purchasers does not necessarily bear on those who might
be confused in the post-sale context.[141]

### 6.    Balancing the *Polaroid* Factors and Other Considerations

For the reasons set forth above, the majority of the *Polaroid* factors
weigh in Dooney & Bourke's favor, leading the Court to conclude that defendant
has demonstrated that there is no genuine issue of material fact on the likelihood
of confusion among consumers as to the source, affiliation, or sponsorship of the
handbags at issue.[142] Summary judgment on a trademark infringement claim is

---

[141]    However, most cases finding actionable post-sale confusion involve a
defendant's counterfeit or "knock-off" copies of the plaintiff's product. *See, e.g.,*
*Cartier v. Symbolix, Inc.*, 386 F. Supp. 2d 354 (S.D.N.Y. 2005).

[142]    *See, e.g., Savin Corp.*, 391 F.3d at 462 (affirming grant of summary
judgment in favor of defendant on trademark infringement claim where the
balance of the *Polaroid* factors weighed in defendant's favor even though one of
the factors favored plaintiff); *Playtex*, 390 F.3d at 166-67 (affirming grant of
summary judgment in favor of defendant on trademark infringement claim where
the court held that, on balance, the *Polaroid* factors favored defendant); *Sly*
*Magazine, LLC v. Weider Publ'ns L.L.C.*, 529 F. Supp. 2d 425, 442 (S.D.N.Y.
2007) (granting defendants summary judgment on trademark infringement claim
where all *Polaroid* factors weighed in defendants' favor and the court therefore

appropriate where the *Polaroid* analysis reveals that "undisputed evidence would lead to only one conclusion."[143]  Although Louis Vuitton's mark is strong and there is a proximity between the products, no one factor is determinative and the *Polaroid* factors cannot be balanced according to a mathematical formula.  Rather, considering all of the evidence and evaluating the *Polaroid* factors, a reasonable jury could only conclude that Dooney & Bourke's mark is not likely to cause confusion with Louis Vuitton's Monogram Multicolore mark.  Accordingly, defendant's motion for summary judgment on plaintiff's trademark infringement claim is granted.

### B.    Trademark Dilution Under the Lanham Act[144]

In contrast to trademark infringement, a cause of action for trademark dilution seeks to prevent the "diminution of the strength of the famous mark []

---

concluded that there was no genuine issue of material fact as to the likelihood of consumer confusion); *Verilux, Inc. v. Hahn*, No. 3:05 Civ. 254, 2007 WL 2318819, at \*9 (D. Conn. Aug. 10, 2007) (granting defendants summary judgment on trademark infringement claim because plaintiff had failed to "raise a genuine issue of material fact as to whether there exists a likelihood of confusion between the source of defendants' and its products" where two *Polaroid* factors supported plaintiff's claim but the balance of the factors did not).

[143]    *The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir. 1996).

[144]    As set forth above, the FTDA governs Louis Vuitton's federal dilution claim insofar as it seeks monetary damages, and the TDRA governs its claim for injunctive relief.  *See supra* Part II. B.

even though no confusion as to source, sponsorship, affiliation or connection has occurred."[145] As a result, "[d]ilution by blurring is not just another name for the injury to a trademark caused by confusion and mistake . . . [it] is a name for a kind of erosion of the strength of a mark that could occur in the *absence* of consumer confusion."[146] "[D]ilution presupposes no mental confusion over affiliation or connection, but rather a state of mind that recognizes independent sources and affiliation."[147]

The Second Circuit has made clear that a "plaintiff cannot prevail on a state or federal dilution claim unless the marks at issue are 'very' or 'substantially similar.'"[148] Here, as previously discussed, because fundamental differences distinguish the marks at issue, they are not sufficiently similar to

---

[145]    4 McCarthy § 24:69.

[146]    *Id.* "The dilution theory grants protection to a strong, well-recognized mark *even in the absence of a likelihood of confusion*, if defendant's use is such as to be likely to diminish or dilute the strong identification value of the plaintiff's mark . . . ." *Id.* § 24:72 (emphasis added). Here, Louis Vuitton claims dilution by blurring under the Lanham Act. *See, e.g.*, Pl. Opp. at 8.

[147]    4 McCarthy § 24:72.

[148]    *Playtex*, 390 F.3d at 167 (quoting *Federal Express Corp. v. Fed. Espresso, Inc.*, 201 F.3d 168, 176 (2d Cir. 2000)).

sustain a dilution claim.[149] Notwithstanding this holding, I assess the other elements of Louis Vuitton's federal dilution claim.

## 1. Famousness of Mark

Dooney & Bourke contends that Louis Vuitton's Monogram Multicolore mark was not sufficiently famous – *i.e.*, "widely recognized by the general consuming public . . . as a designation of source of the goods or services of the mark's owner"[150] – prior to defendant's introduction of the "It Bags" in July 2003. Citing Louis Vuitton's targeted advertising and its limited sales as of July 2003, Dooney & Bourke argues that the Monogram Multicolore mark had not attained the requisite level of fame to sustain a dilution claim as a matter of law.

According to Louis Vuitton, this argument creates a genuine issue of

---

[149]    *Compare id.* (affirming district court's grant of defendant's motion for summary judgment on dilution claim where the marks at issue – "Wet Ones" versus "Quilted Northern Moist-Ones" – were not sufficiently similar to sustain the claim) *with Adidas Am., Inc. v. Payless Shoesource, Inc.*, No. CV 01-1655, 2008 WL 508060, at *23 (D. Or. Feb. 22, 2008) (holding that a reasonable juror could find plaintiff's three-stripe mark and defendant's four-stripe design to be sufficiently close and in fact, nearly identical). *See Playtex Prods., Inc. v. Georgia-Pacific Inc.*, No. 02 Civ. 7848, 2003 WL 21939706, at *8 (S.D.N.Y. Aug. 12, 2003) ("Because I concluded above that the dissimilarity [between plaintiff's mark and defendant's mark] was a major reason that there was no likelihood of consumer confusion [with respect to the trademark infringement claim], it follows that the marks are not sufficiently similar to support a claim for dilution under either the federal or state statute."), *aff'd*, 390 F.3d 158 (2d Cir. 2004).

[150]    15 U.S.C. § 1125(c)(1).

material fact with respect to the Monogram Multicolore mark's fame as of July 2003. I disagree. Despite Louis Vuitton's apparent willingness to have this issue resolved by the fact-finder, there is no genuine issue of material fact. Louis Vuitton's own evidence demonstrates the distinctive quality and great degree of recognition enjoyed by the Monogram Multicolore mark, even by July 2003, and even outside of the fashionista world. For example, according to Louis Vuitton North America's Vice President of Marketing and Communications, the company engaged in "widespread advertising, publicity, promotion and sales of products bearing the Monogram Multicolore [m]ark[]," and enjoyed a deluge of unsolicited media coverage and attention.[151]

Moreover, notwithstanding Dooney & Bourke's contention that Louis Vuitton's "limited advertising did not have [] geographic or demographic reach,"[152] Louis Vuitton spent more money on advertising products bearing the Monogram Multicolore mark in 2003 than during any other year since their

---

[151] Vandenberghe Decl. ¶ 29. *See id.* ¶¶ 16-18. *See also id.* ¶ 29 (stating that the publication *Women's Wear Daily* ranked Louis Vuitton as the ninth most recognized accessory brand in the United States in its *June 2003* listing, and "attributed the success in consumer recognition in part to the Louis Vuitton handbags bearing the Monogram Multicolore [m]arks") (emphasis added).

[152] Def. Mem. at 20.

47

launch.[153] The evidence adequately demonstrates that, far beyond a narrow, niche market, the Monogram Multicolore mark achieved a high level of fame in the broad fashion market by early to mid-2003. Therefore, even under the high standard of fame required to sustain a dilution claim, the Monogram Multicolore mark meets that standard as a matter of law.

### 2. Evidence of Actual Dilution

Louis Vuitton must establish actual dilution in order to recover monetary damages on its dilution claim. However, its anecdotal evidence on actual dilution continues to be insufficient as a matter of law. At most, Louis Vuitton's evidence demonstrates that "consumers mentally associate the junior user's mark with a famous mark."[154] But, as the Supreme Court has made clear, "such mental association is not sufficient to establish actionable dilution" because it does not necessarily "reduce the capacity of the famous mark to identify the goods of its owner, the statutory requirement for dilution under the FTDA."[155] Indeed, "[b]lurring is not a necessary consequence of mental association."[156]

---

[153] *See* Vandenberghe Decl. ¶ 27.

[154] *Moseley*, 537 U.S. at 433.

[155] *Id.*

[156] *Id.* at 434.

48

The record establishes that a number of consumers mentally associated Louis Vuitton's products bearing the Monogram Multicolore mark with Dooney & Bourke's "It Bags," and vice versa. However, similar to the Supreme Court's observation in *Moseley*, "[t]here is a complete absence of evidence of any lessening of the capacity" of the Monogram Multicolore mark "to identify and distinguish the goods or services" offered by Louis Vuitton.[157] In fact, the evidence demonstrates that, rather than eroding the strength of Louis Vuitton's mark, some consumers that made the mental association between the marks at issue directed any "offense" they might have felt from the association towards defendant rather than plaintiff.[158] While some of the evidence shows that certain consumers preferred the "It Bags" for various reasons, it does not sufficiently raise any genuine issues of fact as to the impact of the "It Bags" on the strength of the Monogram Multicolore mark.[159] As Louis Vuitton's own witness affirmed, Louis

---

[157]    *Moseley*, 537 U.S. at 434.

[158]    *See, e.g.*, Pl. Counter 56.1 ¶ 175 ("A Dooney employee directed to collect comments from customers in the ordinary course of business wrote that several customers were turned off to the Dooney It Bags because they thought that it [sic] looked like a Louis Vuitton 'knock-off.'"). *See also Moseley*, 537 U.S. at 434 (stating that an individual who saw an advertisement for defendant's store, which bore the allegedly diluting mark as its name, was offended by it but his offense was directed at the defendant and his opinion of plaintiff was not altered).

[159]    *See, e.g.*, Pl. Counter 56.1 ¶ 175.

49

Vuitton's reputation and standing in the handbag industry has only increased since 2002, despite the introduction and success of the "It Bags" in the market.[160]

## C. State Law Claims

### 1. Trademark Infringement and Unfair Competition

For the reasons set forth above in Part IV.A, no reasonable juror could conclude that there is a likelihood of confusion between the marks at issue for purposes of the Lanham Act. Accordingly, Louis Vuitton's claim under New York law fails as a matter of law for those same reasons.

### 2. Trademark Dilution

There is no genuine issue of material fact that Louis Vuitton's Monogram Multicolore mark is distinctive. Under the six-factor framework for

---

[160]    *See, e.g.*, 7/7/07 Deposition of Nathalie Moulle-Berteaux, Ex. B to Selb Decl., at 38:5-25 (Defendant's counsel: "Has Louis Vuitton's goodwill, reputation and standing in the handbag industry grown throughout the period since 2002?" Moulle-Berteaux: "I do think so, yes."). Additionally, for the reasons set forth in *Vuitton IV* with respect to plaintiff's now-excluded expert Mr. Weston Anson, the substantively similar "evidence" now put forth by plaintiff's witness Guillaume Cardon, Financial Control Manager for Louis Vuitton, fails to raise a genuine issue of material fact because it is "simply not probative of dilution under the substantive law." *Vuitton IV*, 525 F. Supp. 2d at 662-64 (noting that plaintiff has made no effort to "connect a loss of sales in the United States to a loss of reputation on the part of Louis Vuitton and [it] cites no case law to support the proposition that a plaintiff's loss of sales coincident with a defendant's achieving 'critical mass' in the marketplace necessarily implies a loss of reputation" or an erosion of the strength of plaintiff's mark).

assessing likelihood of dilution by blurring under New York law, no reasonable

jury could conclude that Louis Vuitton's Monogram Multicolore mark has been

diluted. *First*, for the reasons stated above, the marks are not similar even when

viewed in market conditions and considering similarity from an initial interest or

post-sale perspective.[161] Similar to the dilution claim brought under the Lanham

Act, I continue to assess the state law dilution claim notwithstanding the holding

that the marks are not similar as a matter of law.[162]

      *Second*, as set forth earlier, Louis Vuitton and Dooney & Bourke

overlap in their consumer bases, and there is no evidence demonstrating any lack

of sophistication of the consumers that comprise those bases. Instead, the

evidence shows that these consumers are discerning and knowledgeable with

respect to the handbag market.

      *Third*, there is some evidence that might suggest that Dooney &

Bourke "adopted its mark hoping to benefit commercially from association with

---

[161]    Because "[o]ne of the factors to be considered for determining
likelihood of dilution is also a factor in likelihood of confusion analysis for
trademark claims under the Lanham Act" – *i.e.*, similarity of the marks – the Court
assesses this factor "in a similar fashion as [it has done] under the Lanham Act."
*Vuitton II*, 454 F.3d at 119.

[162]    *See Savin Corp.*, 391 F.3d at 455 ("A prerequisite to a finding of
dilution is that the marks are substantially similar.") (quotation marks omitted).

51

the senior mark."[163]  However, this evidence is de minimis and this factor is not

dispositive but is just one of the factors for courts to weigh when assessing

likelihood of blurring.

*Fourth*, while the similarity of the products covered – *i.e.*, handbags

and accessories – and the renown of the senior mark favor Louis Vuitton, the

Court must balance all of the factors.[164]  Balancing those factors, it is clear that,

given the dissimilarities between the marks, the general sophistication of the

consumers, and the de minimis nature of the proffered evidence on predatory

intent, there is no genuine issue of material fact that remains to be resolved by the

fact-finder.  Because there is no diminution of the capacity of Louis Vuitton's

mark to serve as a unique identifier of its source, Dooney & Bourke is granted

summary judgment on the state law dilution claim as well.

---

[163]     *Mead Data Cent.*, 875 F.2d at 1037 (citations omitted).

[164]     As I previously stated in *Vuitton I*, the renown of defendant's mark is
largely irrelevant to the analysis here.  "Ordinarily, renown of the junior user's
mark weighs in the senior user's favor, under the theory that the junior mark might
overwhelm the senior mark.  But where, as here, the marks are not substantially
similar, let alone identical, the concept of a junior user makes little sense and lacks
relevance to the issue of dilution by blurring."  *Vuitton I*, 340 F. Supp. 2d at 453
n.210.

## V. CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted in its entirety. The Clerk of the Court is directed to close the motion [document no. 269] and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            May 28, 2008

## - Appearances -

**For Plaintiff**:

Steven Kimelman, Esq.
Michael A. Grow, Esq.
Alison Arden Besunder, Esq.
Arent Fox LLP
1675 Broadway
New York, NY 10019
(212) 484-3900

Theodore C. Max, Esq.
Sheppard Mullin Richter & Hampton LLP
30 Rockefeller Plaza, 24th Floor
New York, NY 10112
(212) 332-2800

**For Defendant**:

Douglas D. Broadwater, Esq.
Roger G. Brooks, Esq.
Darin P. McAtee, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Thomas J. McAndrew, Esq.
Thomas J. McAndrew & Associates
One Turks Head Place, Ste. 205
Providence, RI 02903
(410) 455-0350